**LEO H. HILL and UNITED ASSOCIATION OF JOURNEYMEN PLUMBERS AND STEAMFITTERS OF UNITED STATES AND CANADA, LOCAL NO. 234, v. STATE OF FLORIDA, ex rel. J. TOM WATSON, Attorney General.**

19 So. (2nd) 857                                June Term, 1944
November 28, 1944                                     En Banc

*Jennings & Coffee, Joseph A. Padway* (Washington, D. C.) and *Herbert S. Thatcher,* (Washington, D. C.) for appellants.

*J. Tom Watson,* Attorney General, *Howard S. Bailey* and *R. W. Erwin, Jr.,* Assistant Attorneys General, for appellee.

TERRELL, J.:

The Legislature of 1943 enacted Chapter 21968, Sections 4 and 6 of which are as follows:

"Section 4. No person shall be granted a license or a permit to act as a business agent in the State of Florida, (1) who has not been a citizen of and has not resided in the United States of America for a period of more than ten years next prior to making application for such license or permit. (2) Who has been convicted of a felony. (3) Who is not a person of good moral character; and every person desiring to act as a business agent in the State of Florida shall before doing so obtain a license or permit by filing an application under oath therefor with the Secretary of State, accompanied by a fee of one Dollar. There shall accompany the application a statement signed by the president and secretary of the labor organization for which he proposes to act as agent, showing his authority to do so. The Secretary of State shall hold such application on 'file for a period of thirty days during which time any person may file objections to the issuing of such license or permit. After the expiration of the thirty day period, regardless of whether or not any objections have been filed, the Secretary of State shall submit the application, together with all information that he may have including any objections that may have been filed to such application to a Board to be composed of the Governor as Chairman, the Secretary of State, and the Superintendent of Education. If a majority of the Board shall find that the applicant is qualified, pursuant to the terms of this Act (*and are of the opinion that the public interest requires that a license or permit should be issued to such applicant*), then the Board shall by resolution authorize the Secretary of State to issue such license or permit, same shall be for the calendar year and shall expire on December 31 of the year

for which issued unless sooner surrendered, suspended, or revoked.

"Section 6. Every labor organization operating in the State of Florida shall make a report in writing to the Secretary of State annually on or before July first. Such report shall be filed by the Secretary or business agent of such labor organization and shall be in such form as the Secretary of State may prescribe, and shall show the following facts:

"(1) The name of the labor organization;

"(2) The location of its office;

"(3) The name and address of the president, secretary, treasurer, and business agent.

"At the time of filing such report it shall be the duty of every such labor organization to pay the Secretary of State an annual fee therefor in the sum of One Dollar."

Appellants declined to comply with the provisions of the Act as thus quoted, contending that it was invalid. This suit was brought by the Attorney General to restrain Local 234 from functioning as a labor organization and Leo H. Hill from acting as its business agent pending compliance with the law. A motion to dismiss the bill was overruled. An answer interposed various defenses predicated on the State and Federal Constitutions. On final hearing, Section 6 was upheld as valid in toto. As to Section 4, the Court deleted the words "and are·of the opinion that the public interest requires that a license or permit should be issued to such applicant," and upheld it in all other respects. This appeal is from the decree so entered.

It appears that the trial court deleted the provision from Section 4 because it vested arbitrary power in the Board and was in conflict with the standard of qualification prescribed for one applying for a license to be a business agent of a labor union rendering it unconstitutional. We approve this holding.

It is first contended that Sections 4 and 6 as quoted and deleted are void because they restrain the exercise of appellants' civil rights guaranteed by the First Amendment to the Federal Constitution.

In essence, Section 4 of Chapter 21968 hereafter referred to as House Bill 142, creates a State Licensing Board composed of the Governor, Secretary of State, and the State Superintendent of Public Instruction. All business agents for labor organizations must secure a permit from the State Licensing Board and as a prerequisite for securing such permit they must furnish proof that they have been (A) a citizen of the United States for more than ten years next preceding their application for the permit, (B) have not been convicted of a felony, (C) must be of good moral character and Section 6 requires them to accompany the application with a fee of One Dollar.

Similar regulations are imposed on attorneys, physicians, barbers, insurance agents, real estate brokers, nurses, beauty parlor operators, civil engineers, architects, liquor dealers, and many others engaged in gainful occupations. All such requirements have been upheld in the interest of the public health, morals, safety, welfare, and prosperity of the people. They are imposed on the theory that the business engaged in by the applicant vitally affects the public welfare and that the public is entitled to the protection they afford.

Such regulations have been imposed under the police power of the State and have been generally upheld for reasons so academic that it would hardly seem necessary to cite authority to support them. Appellant's answer to this is that they are like religious associations, law and order leagues, citizens committees, and chambers of commerce, and should, like these, be exempt from such regulations. Our attention is directed to no similarity between labor unions and the last named institutions and as we shall later show, there is no basis to grant them the same exemption.

Appellants contend that these regulations unduly restrict their freedom of speech, free press, and free assembly. This contention overlooks the fact that none of these guaranties are absolutes but are subject to reasonable police regulation in the interest of the public. It would be difficult to name an organization that more vitally affects the public or one in which the public is more vitally interested than the organizations of labor. Their activities and their public relations

of late years have frequently pushed the war and every other human relation off the front page. To hold that their agents may not be regulated in the manner prescribed here would amount to a reversal of our holding with reference to every other kindred relation. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 57 Sup. Ct. 615, 81 L. Ed. 893; Riley v. Sweat, 110 Fla. 362, 149 So. 48; Page v. State Board of Medical Examiners, 141 Fla. 294, 193 So. 82; State ex rel. Munch v. Davis, 143 Fla. 236, 196 So. 491; State Board of Funeral Directors v. Cooksey, 147 Fla. 337, 3 So. (2nd) 502.

Appellants also contend that Sections 4 and 6 of House Bill 142 unduly restrict their right to assemble as working men, to solicit membership in labor organizations and that the fee charged is an undue restraint on these and other civil rights. They rely on Murdock v. Pennsylvania, 319 U. S. 105, 63 Sup. Ct. 870, 87 L. Ed. 1292, and that line of cases to uphold this contention.

The gist of this contention is that they are no different from religious, fraternal, and charitable organizations and should enjoy the same immunity from license or other restraints. The answer to this contention is that religious, fraternal, and charitable organizations are in terms immunized from licence taxes and other regulations on the theory that they minister to the spiritual, moral, educational and other necessities of the community. They are very largely gratituous, are not imbued with the profit aspect and there is every reason why they should be so immunized while none of the reasons that immunize them have been shown to be attached to labor organizations.

The Federal Supreme Court has repeatedly upheld acts regulating different phases of employer and labor relations in the interest of the common good. National Labor Relations Board v. Electric Vacuum Cleaner Co., 120 Fed. (2nd) 611, reversed on other grounds in 315 U. S. 685, 62 Sup. Ct. 846, 86 L. Ed. 1120; American Steel Foundaries v. Tri-City Central Trades Council, 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. 189. In the briefs of counsel for the State, our attention is directed to acts by at least eleven other states, Alabama,

Kansas, Arkansas, Wisconsin, South Dakota, Idaho, Texas, Michigan, Pennsylvania, Massachusetts, and Minnesota regulating some phase of labor relations. Some of these acts are very similar to the one in question but others are different in some respects. The case of Ex parte Thomas, 141 Tex. 591, 174 S. W. (2nd) 958, is illuminating on the point because in most features, the Texas act is similar to ours and it upholds the power of the State to regulate labor unions under its police power. Casual review of the cases cited would seem to settle the controversy beyond question.

The requirement of Section 6 to file annual reports giving (1) the name of labor organization, (2) the location of its office, and (3) the name and address of its president, secretary, treasurer, and business agent is supported by similar requirements in acts of Kansas, Texas, Wisconsin, Idaho, South Dakota, and Alabama. The Alabama Act was upheld by the Alabama Supreme Court in Alabama State Federation of Labor v. Robert E. McAdory, ...... Ala. ......, 18 So. (2nd) 810. The opinion treats in a very illuminating manner this and other phases of labor union regulation.

The charge that House Bill 142 is new legislation hardly merits consideration. In a democracy like ours, regulatory legislation never precedes but always follows a felt necessity or demand for it. No social system could long endure that does not remain responsive to the need for change and flexible enough to modify its legislative patterns to compass the changes. Every form of social organization must be constantly amended to meet new techniques and changing circumstances. Call it progress or liberalism as you will, the instant we lose the incentive, we become static and ultimately perish.

As to the charge of One Dollar for a business agent's license, appellants contend that this is in reality a tax which amounts to a restraint on their civil rights, that is to say the right of workers to assemble for mutual aid and protection, to circulate and disseminate information, to form and join unions and to solicit others to join them.

We see no merit to this contention. The fee of One Dollar is nothing more than a charge to defray the cost of

the service. Neither Section 4 or 6 in any way affects the right of workmen to assemble for mutual aid, to circulate information or to organize and invite others to join them. These are all rights this Court has repeatedly recognized. Paramount Enterprises Inc. v. Mitchell, 104 Fla. 407, 140 So. 328.

We have reviewed all the cases cited by appellants in support of their contention as to civil rights but their main reliance appears to be on Thornhill v. Alabama, 310 U. S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093; Schneider v. Irvington, 308 U. S. 147, 60 Sup. Ct. 146, 84 L. Ed. 155; Lovell v. Griffin, 303 U. S. 444, 58 Sup. 666, 82 L. Ed. 949; Hague v. C. I. O. 307 U. S. 496, 59 Sup. Ct. 954, 83 L. Ed. 1423; Cantwell v. Connecticut, 310 U. S. 296, 60 Sup. Ct. 900 84 L. Ed. 1213; Near v. Minnesota, ex rel. Olson, 283 U. S. 697, 51 Sup. Ct. 625, 75 L. Ed. 1357; Am. F. of L. v. Swing, 312 U. S. 321, 61 Sup. Ct. 568, 85 L. Ed. 855, and like cases. These cases have all been reviewed in connection with the case at bar as well as in former decisions of this Court and we think are directed to statutes or ordinances prohibiting the distribution of literature without a special permit depending on the arbitrary discretion of the mayor or some other officer. For this or some similar reason, they are not in point with the case at bar.

It is quite true that in Thornhill v. Alabama, first cited in the preceding paragraph, the Court brought "picketing" within the protection of the Bill of Rights but so far as we have been able to find, organizing labor unions, collective bargaining, boycotting, striking, and other labor practices have been so immunized. It may be that conditions will arise in the future in which other labor practices should be so protected but such a case must await the appropriate conditions. With the facts before us, it certainly would be a tortured construction of the Bill of Rights to hold that other lines of endeavor are subject to police regulation but that labor unions are free from any species of regulation.

Individual freedoms guaranteed by the Constitution did not become such by chance. They were designed as a buffer to personal worth; they have no relation to institutions but

they raised man to his full stature, put sand in his "guts" and raised him to a level with kings. Freedom of speech, for example, was first employed to guarantee members of Parliament that they would not be called on the carpet by the king for any discussion they participated in on the floor of the house regarding public affairs. The right was later extended to the citizen as to all political discussion and when our Constitution was adopted, it was first included as one of the fundamental rights available to every citizen.

Labor unions, like other trade, professional and business organizations are concerned with the business of making a living. They do not bother themselves with the things that concern religious bodies, chambers of commerce and like institutions. It is on this basis that we say they are subject to the police power, but can it be reasonably contended that Sections 4 and 6 of House Bill 142 impose any unreasonable burden on them? Section 4 requires nothing more than a showing of the Americanism, good moral character, and freedom from felony of their business agents and Section 6 requires them to furnish the Secretary of State their name, place of business, and the name and address of the president, secretary, treasurer, and business agent. Literally thousands of persons and institutions over the country are required by State and Federal Governments to furnish similar information and many of them much more. In fact, the requirement of Section 6 goes only to information that is common knowledge in the community where the labor union is located and most of it goes to the public on the communications it sends out.

We have long since gotten away from the idea that human relations which affect the public welfare can be transacted in a moral vacuum. Good moral character and sound Americanism is the very basis on which democratic institutions rest. It permeates every aspect of human relations from the White House down to the most juvenile community enterprise. A boy cannot get into a marble game if he does not play the game in recognition of the moral that his companions have rights that he must respect and the same moral thread runs through business relations, labor

relations, and all other relations that affect the public. Democratic institutions would go to pot quicker than it would take to tell how except for the moral standard on which they are pitched. It is past understanding that any one who plies his trade, business, or profession for a living should seriously contend that he is footloose in a moral universe with carte blanche to do as he pleases when others in like situation are bound by every restriction the Bill of Rights will permit. In this State of the law, it would seem idle to say that one's civil rights were unduly hobbled to require him to show his good moral character that he had been exposed to the American way of life for ten years, that he had not committed a felony, where he is conducting his business, and who is conducting it for him.

The sole test for the exercise of the police power is reasonableness. True, the Legislature cannot under the guise of the police power arbitrarily invade personal or property rights or interfere with private business but if the statute has some rational relation to the safety, health, morals, or general welfare and the means employed may be reasonably said to accomplish the desired purpose, it is within the scope of the police power. The means adopted by the act must be reasonably necessary. They must be reasonable in their effect on the person, must not be oppressive and must not be designed for the annoyance of any particular person or class.

It is next contended that Sections 4 and 6 of House Bill 142 invade the field covered by the National Labor Relations Act and consequently it is non enforceable.

This contention proceeds on the presumption that the National Labor Relations Act preempts the field of labor regulation and removes any power on the part of the states to do so. If appellants' contentions were true, the National Labor Relations Act rather than the Act in question would go down under the Constitution. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 57 Sup. Ct. 615, 81 L. Ed. 893; Wisconsin Labor Relations Board v. Fred Rueping Leather Co., 228 Wis. 473, 279 N. W. 673. In both these cases it was held that the power of Congress to

regulate labor relations rested on the commerce clause while the power of the State rested on the police power and that the State power was supreme when no undue burden was laid on interstate commerce. Unless interstate commerce is obstructed, the Federal Act may not be called into operation.

It is next contended that House Bill 142 is invalid for discrimination in that Section 15 exempts associations of railway employees from its provisions contrary to the equal protection clause of the fourteenth Amendment.

On this point, it is sufficient to say that all the state acts herein referred to make similar exemptions and none of them that have been assaulted for this reason have been stricken down. In fact, it seems to be a classification common to acts of this kind and one the Legislature was empowered to make. Alabama State Federation of Labor v. McAdory, ...... Ala. ......, 18 So. (2nd) 810; A. F. of L. v. Reilly, 7 Labor Cases, 65, 168.

In our treatment of House Bill 142, we have observed the line followed by counsel in their briefs. In other words, Sections 4 and 6 have generally been treated together. It is true that their provisions overlap but in the main, Section 4 applies to the business agent and Section 6 applies to the union or organization. A better practice would have been to recognize this distinction in the opinion but it would have resulted in much duplication and a more tedious discussion. The point is that labor organizations so vitally affect the public that they may be regulated in like manner as other organizations likewise engaged and their business agents may be subject to like regulation as insurance agents, real estate brokers, and others engaged in occupations that affect the public. The purpose of the regulation is not punic but to preserve the democratic process and bring to the knowledge of the individual or group regulated that it has an obligation to the public that rises above its personal or group interest.

Other questions argued have been considered but we find no reversible error.

Affirmed.

BUFORD, C. J., BROWN, CHAPMAN, THOMAS, ADAMS and SEBRING, JJ., concur.