325 U.S. 538 (1945)
HILL ET AL.
v.
FLORIDA EX REL. WATSON, ATTORNEY GENERAL.
No. 811.
Supreme Court of United States.
Argued April 4, 5, 1945.
Decided June 11, 1945.
CERTIORARI TO THE SUPREME COURT OF FLORIDA.
Messrs. Joseph A. Padway and Herbert S. Thatcher for petitioners.
*539 J. Tom Watson, Attorney General of Florida, and Howard S. Bailey, Assistant Attorney General, for respondent.
Briefs were filed by Solicitor General Fahy, Messrs. Robert L. Stern, Alvin J. Rockwell, Miss Ruth Weyand and Mrs. Elizabeth W. Weston on behalf of the United States; Messrs. Arthur Garfield Hayes and Osmond K. Fraenkel on behalf of the American Civil Liberties Union; and Mr. Paul O'Dwyer on behalf of the Workers Defense League, as amici curiae, in support of petitioners.
MR. JUSTICE BLACK delivered the opinion of the Court.
The only question we find it necessary to decide in this case is whether a Florida statute[1] regulating labor union activities has been applied to these petitioners in a manner which brings it into irreconcilable conflict with the collective bargaining regulations of the National Labor Relations Act. 49 Stat. 449. That Federal Act, we decided in Allen-Bradley Local v. Wisconsin Board, 315 U.S. 740, did not wholly foreclose state power to regulate labor union activities. Certain conduct, such as mass picketing, threats, violence, and related actions, we held were not governed by the Wagner Act, and hence, Wisconsin was free to regulate them. We carefully pointed out, however, that had the state order under consideration, "affected the status of the employees, or . . . caused a forfeiture of collective bargaining rights, a distinctly different question would arise." That question which we so distinctly reserved in the Wisconsin case has now arisen in this case.
The Attorney General of Florida filed a bill for injunction against the petitioner union and its business agent, Hill, in a state court. He sought to restrain both of them *540 from functioning as such until they had complied with the Florida statute. The basis for the relief sought against Hill was that he had for a pecuniary reward acted as a business agent in violation of § 4; the basis for the relief sought against the union was that it had operated without obtaining a state license as required by § 6. Section 4, which was invoked against Hill, provides that no one shall be licensed as a "business agent" of a labor union who has not been a citizen of the United States for more than 10 years, who has been convicted of a felony, or who is not a person of good moral character. Application for a license as a "business agent" must be accompanied by a $1.00 fee and a statement signed by officers of the union setting forth the agent's authority. The statute then provides that the application be held for 30 days to permit the filing of objections to the issuance of a license. A Board, composed of the Governor, the Secretary of State, and the Superintendent of Education, then passes on the application, and if it finds the applicant measures up to the standards of the act, as it sees them, it authorizes the license to be issued, to "expire on December 31 of the year for which issued unless sooner surrendered, suspended, or revoked." Section 2 (2) defines "business agent" as "any person who shall for a pecuniary or financial consideration act or attempt to act" for a union "in soliciting or receiving from any employer any right or privilege for employees. . ." or "in the issuance of membership or authorization cards, work permits or any other evidence of rights granted or claimed in, or by, a labor organization . . ." Section 6, which the Attorney General invoked against the union, requires every labor union "operating" in the state to file a written report with the Secretary of State, disclosing its name, the location of its offices, and the names and addresses of its officers. Section 14 makes it a misdemeanor for "any person or labor organization" to violate the statute.
*541 Motions by Hill and the union to dismiss the bill on the ground that the state statute violated the Fourteenth Amendment and conflicted with the Wagner Act were denied. Answers were then filed admitting violations of §§ 4 and 6. The court held the licensing and reporting provisions valid. Hill was enjoined from further acting as the union's business agent until he obtained a state license. The union was enjoined from further functioning and operating until it made the report and paid the fee to the Secretary of State. The State Supreme Court affirmed. 155 Fla. 254, 19 So.2d 857.
It is apparent that the Florida statute has been so construed and applied that the union and its selected representative are prohibited from functioning as collective bargaining agents, or in any other capacity, except upon conditions fixed by Florida. The declared purpose of the Wagner Act, as shown in its first section, is to encourage collective bargaining, and to protect the "full freedom" of workers in the selection of bargaining representatives of their own choice. To this end Congress made it illegal for an employer to interfere with, restrain or coerce employees in selecting their representatives. Congress attached no conditions whatsoever to their freedom of choice in this respect. Their own best judgment, not that of someone else, was to be their guide. "Full freedom" to choose an agent means freedom to pass upon that agent's qualifications.
Section 4 of the Florida Act circumscribes the "full freedom" of choice which Congress said employees should possess. It does this by requiring a "business agent" to prove to the satisfaction of a Florida Board that he measures up to standards set by the State of Florida as one who, among other things, performs the exact function of a collective bargaining representative. To the extent that § 4 limits a union's choice of such an "agent" or bargaining representative, it substitutes Florida's judgment for the workers' judgment.
*542 Thus, the "full freedom" of employees in collective bargaining which Congress envisioned as essential to protect the free flow of commerce among the states would be, by the Florida statute, shrunk to a greatly limited freedom. No elaboration seems required to demonstrate that § 4 as applied here "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67; Cloverleaf Butter Co. v. Patterson, 315 U.S. 148; Napier v. Atlantic Coast Line R. Co., 272 U.S. 605. It is not amiss, however, to call attention to the fact that operation of this very section has already interfered with the collective bargaining process. An employer before the Labor Board defended its refusal to bargain with a duly selected representative of workers on the ground that the representative had not secured a Florida license as a business agent. In the Matter of Eppinger & Russell Co., 56 N.L.R.B. 1259. The Board properly rejected the employer's contention, holding that Congress did not intend to subject the "full freedom" of employees to the eroding process of "varied and perhaps conflicting provisions of state enactments." Cf. Labor Board v. Hearst Publications, 322 U.S. 111.
Since the Labor Board has held that an employer must bargain with a properly selected union agent despite his failure to secure a Florida license, it is argued that the state law does not interfere with the collective bargaining process. But here, this agent has been enjoined, and if the Florida law is valid he could be found guilty of a contempt for doing that which the act of Congress permits him to do. Furthermore, he could, under § 14 of the state law, be convicted of a misdemeanor and subjected to fine and imprisonment. The collective bargaining which Congress has authorized contemplates two parties free to bargain, and cannot thus be frustrated by state legislation. We hold that § 4 of the Florida Act is repugnant to the National Labor Relations Act.
*543 Section 6, as here applied, stands no better. The requirement as to the filing of information and the payment of a $1.00 annual fee does not, in and of itself, conflict with the Federal Act. But, for failure to comply, this union has been enjoined from functioning as a labor union. It could not without violating the injunction and also subjecting itself to the possibility of criminal punishment even attempt to bargain to settle a controversy or a strike. It is the sanction here imposed, and not the duty to report, which brings about a situation inconsistent with the federally protected process of collective bargaining. Cf. Western Union Co. v. Massachusetts, 125 U.S. 530, 553, 554; Kansas City Southern R. Co. v. Kaw Valley Drainage District, 233 U.S. 75, 78; St. Louis S.W.R. Co. v. Arkansas, 235 U.S. 350, 368. This is true because if the union or its representatives acted as bargaining agents without making the required reports, presumably they would be liable both to punishment for contempt of court and to conviction under the misdemeanor section of the act. Such an obstacle to collective bargaining cannot be created consistently with the Federal Act.
Nor can it be argued that our decision in Thomas v. Collins, 323 U.S. 516, forecloses such result. In that case we did not have, as here, to deal with such a direct impediment to the free exercise of the federally established right to collective bargaining.
Our holding is that the National Labor Relations Act and §§ 4 and 6 of the Florida Act as here applied cannot "move freely within the orbits of their respective purposes without impinging upon one another." Union Brokerage Co. v. Jensen, 322 U.S. 202, 207.[2] Accordingly the case *544 is reversed and remanded for proceedings not inconsistent with this opinion.
Reversed and remanded.
MR. CHIEF JUSTICE STONE.
I concur in so much of the opinion as finds conflict between the licensing provisions of the Florida statute and the National Labor Relations Act. I do so only on the ground that the command of § 7 of the National Labor Relations Act that "employees shall have the right . . . to bargain collectively through representatives of their own choosing" conflicts with the licensing provisions of the Florida Act purporting to fix the qualifications of business agents of labor organizations.
This, of course, does not mean that labor unions or their officers are immune, in other respects, from the exercise of the state's police power to punish fraud, violence, or other forms of misconduct, either because of the commerce clause or the National Labor Relations Act. It is familiar ground that the commerce clause does not itself preclude a state from regulating those matters which, not being themselves interstate commerce, nevertheless affect the commerce, California v. Thompson, 313 U.S. 109, 113-114, 116, and cases cited; Parker v. Brown, 317 U.S. 341, 360, and cases cited, and that the state's authority is curtailed only as Congress may by law prescribe in the exercise of the commerce power. United States v. Darby, 312 U.S. 100, 119, and cases cited. I can find nothing in *545 the National Labor Relations Act or its legislative history to suggest a Congressional purpose to withdraw the punishment of fraud or violence, or the violation of any state law otherwise valid, from the state's power merely because the state might subject the business agent of a labor union, who violates its law, to imprisonment, which would prevent his functioning as a bargaining agent for employees under the National Labor Relations Act. Allen-Bradley Local v. Board, 315 U.S. 740, 748. See S. Rep. No. 573, 74th Cong., 1st Sess.; H. Rep. No. 1147, 74th Cong., 1st Sess.
For the same reasons, the National Labor Relations Act does not preclude a state from requiring a labor union, or its officers and agents, as such, to procure licenses or make reports or perform other duties which do not materially obstruct the exercise of rights conferred by the National Labor Relations Act or other federal legislation. Thomas v. Collins, 323 U.S. 516, 542. But it is quite another matter to say that a state may fix standards or qualifications for labor unions and their officers and agents which would preclude any of them from being chosen and from functioning as bargaining agents under § 7 of the National Labor Relations Act. The right conferred on employees to bargain collectively through a representative of their own choosing is the foundation of the National Labor Relations Act. Without that right, or if it were restricted by state action, the Act as drawn would have little scope for operation. The fact that the National Labor Relations Act imposes sanctions on the employer alone does not mean that it did not, by § 7, confer the right on employees as against others as well as the employer to make an uninhibited choice of their bargaining agents. Cf. United States v. Hutcheson, 312 U.S. 219. Section 7 confers the right of choice generally on employees and not merely as against the employer.
*546 I dissent from so much of the opinion as holds that § 6 of the Florida statute, as applied, is invalid because it conflicts with the National Labor Relations Act. The requirement of filing by a labor organization of the information prescribed by § 6, accompanied by a filing fee of $1.00, is, as the opinion of the Court recognizes, not incompatible with the National Labor Relations Act, since it in no substantial way hinders or interferes with the performance of the union's functions under that Act. Thomas v. Collins, supra, 542; cf. Northwestern Bell Tel. Co. v. Nebraska Comm'n, 297 U.S. 471, 478; see Smith v. Illinois Bell Tel. Co., 282 U.S. 133; Western Distributing Co. v. Public Service Comm'n, 285 U.S. 119; Dayton Power Co. v. Public Utilities Comm'n, 292 U.S. 290; Natural Gas Co. v. Slattery, 302 U.S. 300, 306.
Notwithstanding the conflict between the commerce clause or the federal statute and the local regulation which was found in Western Union Co. v. Massachusetts, 125 U.S. 530, 554, and St. Louis S.W.R. Co. v. Arkansas, 235 U.S. 350, 368, I can find no logical or persuasive legal ground or practical reason for saying that Congress by the enactment of the National Labor Relations Act intended to preclude the state from exercising to the utmost extent its sovereign power to enforce the lawful demands of § 6 of the Florida Act. There is no more occasion for implying such a Congressional purpose where the union is prevented from functioning by punishment or injunction, for a violation of a valid state law, than for saying that Congress, by the National Labor Relations Act, intended to forbid the states to arrest and imprison a labor leader for the violation of any other valid state law, because that would prevent his or the union's functioning under the National Labor Relations Act. The question is wholly one of state power. Here the state power is not restricted by the commerce clause standing alone, nor, so far as I can see, by any Congressional intention expressed *547 in the provisions of the National Labor Relations Act. Union Brokerage Co. v. Jensen, 322 U.S. 202, 206.
MR. JUSTICE FRANKFURTER, dissenting.
The Court is striking down a State law not because such a statute in and of itself is beyond the power of a State to enact. The Florida statute is nullified because, so Florida is told, Congress has barred Florida from this lawmaking, although Congress has neither expressly nor by fair inference forbidden Florida to deal with the matter with which Florida has dealt and Congress has not. Concretely, Congress by protecting employees in their right to choose representatives for collective bargaining free from the coercion or influence of employers did not impliedly wipe out the right of States under their police power to require qualifications appropriate for union officials having fiduciary duties.
It was settled early in our constitutional history that the mere fact that Congress has power to regulate commerce among the several States does not exclude State legislation in the exercise of the police power, even though it may affect such commerce, where the subject matter does not demand a nation-wide rule. Willson v. Blackbird Creek Marsh Co., 2 Pet. 245; Cooley v. Board of Wardens, 12 How. 299, 319. The States, in short, may speak on matters even in the general domain of commerce so long as Congress is silent. But when Congress has spoken, although not as fully as the Constitution authorizes, that is, when a federal enactment falls short of the Congressional power to legislate touching commerce, the States may still speak where Congress is still silent. The real question is: Has Congress spoken so as to silence the States? The same regard for the harmonious balance of our federal system, whereby the States may protect local interests despite the dormant Commerce Clause, allows State legislation for the protection of local interests so *548 long as Congress has not supplanted local regulation either by a regulation of its own or by an unmistakable indication that there is to be no regulation at all. The relation of such enactments of local concern to federal enactments which fall short of the full reach of the Constitution raises a problem of judicial judgment similar to that presented where a State law encounters no federal statute. The problem is one of judicial accommodation between respect for the supplanting authority of Congress and the reserved police power of the States. Long ago this policy of accommodation was formulated by this Court: "We agree, that in the application of this principle of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together." Sinnot v. Davenport, 22 How. 227, 243.
But conflicts between State laws regulating aspects of business enterprise and federal enactments relating to such aspects were few and far between in the first hundred years of our history. Apart from taxes and tariffs, the regulation of fisheries, and measures dealing with the coastwise trade, there was little intervention by federal legislation in the affairs of men until, in 1887, the Interstate Commerce Act initiated the tide of federal regulation. Since then, this Court has often had to deal with the claim that a federal statute, though only partially regulating a particular phase of commerce, superseded State legislation in the exercise of the police power bearing upon that phase.
In a great variety of cases, the Court has applied the accommodation formulated in Sinnot v. Davenport, supra, and either reasserted or reinforced that policy. The emphasis has been on recognizing that both the State law and the federal statute must be allowed to prevail if they may prevail together  that is, if they do not, as a *549 matter of language or practical enforcement, collide, or if Congress has not manifested an unambiguous purpose that there be no regulation, either State or federal, as to matters for which it has not prescribed. This judicial principle is established by an impressive body of opinions. A few samples must suffice:
1. "May not these statutory provisions stand without obstructing or embarrassing the execution of the act of Congress? This question must of course be determined with reference to the settled rule that a statute enacted in execution of a reserved power of the State is not to be regarded as inconsistent with an act of Congress passed in the execution of a clear power under the Constitution, unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or stand together." Missouri, K. & T.R. Co. v. Haber, 169 U.S. 613, 623.
2. "It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the States, even when it may do so, unless its purpose to effect that result is clearly manifested. . . .
"The principle is universal that legislation, whether by Congress or by a State, must be taken to be valid, unless the contrary is made clearly to appear; and as the contrary does not so appear, the statute of Colorado is to be taken as a constitutional exercise of the power of the State." Reid v. Colorado, 187 U.S. 137, 148, 153.
3. "Is, then, a denial to the State of the exercise of its power for the purposes in question necessarily implied in the Federal statute? For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished  if its operation within its chosen field else must be frustrated and its provisions be refused their *550 natural effect  the state law must yield to the regulation of Congress within the sphere of its delegated power. . . .
"But the intent to supersede the exercise by the State of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the State. This principle has had abundant illustration." Savage v. Jones, 225 U.S. 501, 533.
4. "These cases recognize the established rule that a state law enacted under any of the reserved powers  especially if under the police power  is not to be set aside as inconsistent with an act of Congress, unless there is actual repugnancy, or unless Congress has, at least, manifested a purpose to exercise its paramount authority over the subject. The rule rests upon fundamental grounds that should not be disregarded." Missouri, K. & T.R. Co. v. Harris, 234 U.S. 412, 418-419.
5. "In construing federal statutes enacted under the power conferred by the commerce clause of the Constitution the rule is that it should never be held that Congress intends to supersede or suspend the exercise of the reserved powers of a State, even where that may be done, unless, and except so far as, its purpose to do so is clearly manifested." Illinois Central R. Co. v. Public Utilities Comm'n, 245 U.S. 493, 510.
6. "The principle thus applicable has been frequently stated. It is that the Congress may circumscribe its regulation and occupy a limited field, and that the intention to supersede the exercise by the State of its authority as to matters not covered by the federal legislation is not to be implied unless the Act of Congress fairly interpreted is in conflict with the law of the State." Atchison, T. & S.F.R. Co. v. Railroad Comm'n, 283 U.S. 380, 392-393.
*551 7. "Unless limited by the exercise of federal authority under the commerce clause, the State has power to make and enforce the order. The purpose of Congress to supersede or exclude state action against the ravages of the disease is not lightly to be inferred. The intention so to do must definitely and clearly appear." Mintz v. Baldwin, 289 U.S. 346, 350.
8. "The power conferred upon the Congress is such that when exerted it excludes and supersedes state legislation in respect of the same matter. But Congress may so circumscribe its regulation as to leave a part of the subject open to state action. Atlantic Coast Line v. Georgia, 234 U.S. 280, 290. Cf. Napier v. Atlantic Coast Line, 272 U.S. 605. The purpose exclusively to regulate need not be specifically declared. New York Central R. Co. v. Winfield, 244 U.S. 147. But, ordinarily such intention will not be implied unless, when fairly interpreted, the federal measure is plainly inconsistent with state regulation of the same matter." Gilvary v. Cuyahoga Valley R. Co., 292 U.S. 57, 60.
9. "The case calls for the application of the well-established principle that Congress may circumscribe its regulation and occupy a limited field, and that the intent to supersede the exercise by the State of its police power as to matters not covered by the federal legislation is not to be implied unless the latter fairly interpreted is in actual conflict with the state law." Townsend v. Yeomans, 301 U.S. 441, 454.
10. "States are thus enabled to deal with local exigencies and to exert in the absence of conflict with federal legislation an essential protective power. And when Congress does exercise its paramount authority, it is obvious that Congress may determine how far its regulation shall go. There is no constitutional rule which compels Congress to occupy the whole field. Congress may circumscribe its regulation and occupy only a limited field. *552 When it does so, state regulation outside that limited field and otherwise admissible is not forbidden or displaced. The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so `direct and positive' that the two acts cannot `be reconciled or consistently stand together.'" Kelly v. Washington, 302 U.S. 1, 10.
These rules of respect for the allowable area of State law have not been ceremonial phrases dishonored in observance. Deviations from this policy have been very rare, considering the fact that we are dealing not with a mathematical formula but with the application of a constitutional doctrine by judicial judgment. The deviations have been so rare all these decades, despite the changes in the Court, because of fidelity to the purposes of this vital aspect of our federalism.
A survey of the scores of cases in which the claim has been made that State action cannot survive some contradictory command of Congress leaves no doubt that State action has not been set aside on mere generalities about Congress having "occupied the field," or on the basis of loose talk instead of demonstrations about "conflict" between State and federal action. We are in the domain of government and practical affairs, and this Court has not stifled State action, unless what the State has required, in the light of what Congress has ordered, would truly entail contradictory duties or make actual, not argumentative, inroads on what Congress has commanded or forbidden.
Since the bulk of federal regulatory legislation has until recently been concerned with the great interstate utilities, the cases dealing with the relation of State to federal legislation in this field shed most light on the question before us. Moreover, these present situations least favorable to tolerance for State legislation. The *553 need for national control, with corresponding restriction of local regulation, is presumably most powerfully asserted where interstate transportation and communication are involved.
The range and particularity of federal legislation regulating railroads, expressed in a long series of enactments, have given rise to most of the cases in which State action has been found in conflict with federal action. Once Congress established a uniform federal rule concerning liability for freight loss or damage in place of the variegated rules of the several States, State policy "differently conceived" had to yield. Charleston & W.C.R. Co. v. Varnville Co., 237 U.S. 597, 604. The comprehensive control over railroad rates, progressively exercised by Congress, necessarily displaced much prior State law. And so, the permissive power of States to deal with aspects of transportation in the absence of federal law ceased when State action ran counter to the specific requirements of the Hepburn Act. Southern R. Co. v. Reid, 222 U.S. 424; Chicago, R.I. & P.R. Co. v. Hardwick Elevator Co., 226 U.S. 426. State regulation of the hours of railroad employees could not survive a Congressional policy as to hours of service. Northern Pacific R. Co. v. Washington, 222 U.S. 370. Explicitness by Congress relating to the equipping of freight cars with safety appliances superseded a State law dealing differently with such safety requirements. Southern R. Co. v. Railroad Comm'n, 236 U.S. 439. When Congress saw fit to define in the Federal Employers Liability Act a carrier's responsibility for the death or injury of its employees, a State could not assert a different basis of responsibility. N.Y. Central R. Co. v. Winfield, 244 U.S. 147. Uniform standards set by the Interstate Commerce Commission for the equipment of locomotives preclude different requirements for such equipment by the States. Napier v. Atlantic Coast Line, 272 U.S. 605. But merely because regulatory power is *554 possessed by a federal agency does not displace State regulation if no federal standards are set. See Welch Co. v. New Hampshire, 306 U.S. 79; Eichholz v. Public Service Comm'n, 306 U.S. 268. That even in this technical field a State is not denied the exercise of its police power beyond what is practically required by the actual use of federal power, is illustrated by the limited application given to Pennsylvania R. Co. v. Public Service Comm'n, 250 U.S. 566, in Terminal Assn. v. Trainmen, 318 U.S. 1.
These are illustrations of a closely knit body of regulations, full of technical implications, protected against incursions from local discriminations as to the very subject matter for which Congress deemed a national rule essential. There was, in short, concreteness of conflict between what a State prescribed and what Congress prescribed; the collision was demonstrable, not argumentative.
Even where the enforcement of a State statute carries international implications and thus deals with sensitive concerns peculiarly within the direction of federal authority, this Court only recently was slow to strike down an exercise of the State police power. When, in Hines v. Davidowitz, 312 U.S. 52, the United States strongly urged upon us that a Pennsylvania system of alien registration, established in 1939, had been superseded by the Federal Alien Registration Act of 1940, we did not displace the State law cavalierly, on the basis of loose inference and dogmatic assertion, but examined with painstaking care the particular requirements of Pennsylvania in order to ascertain whether, in their practical operation, they ran counter to the scheme as conceived by Congress and impinged upon its administration. A detailed examination of the long course of federal legislation affecting aliens, of which the Act of 1940 was the latest in a series, led the Court to conclude that Congress *555 had "provided a standard for alien registration in a single integrated and all-embracing system . . . through one uniform national registration system" to which Pennsylvania had to subordinate its local policy. 312 U.S. 52, 74. Even this conclusion evoked a weighty dissent, and one cannot read the Court's opinion without an awareness that the case presented a close question. Shortly after this decision we unanimously made it clear that Hines v. Davidowitz was not intended to relax the requirement of practical and effective conflict between a State law and a federal enactment before a State police measure can be nullified, and that the international bearing of the circumstances made persuasive the finding of conflict in that case. What was said about Hines v. Davidowitz in Allen-Bradley Local v. Board, 315 U.S. 740, 749, is precisely relevant here:
"In the Hines case, a federal system of alien registration was held to supersede a state system of registration. But there we were dealing with a problem which had an impact on the general field of foreign relations. The delicacy of the issues which were posed alone raised grave questions as to the propriety of allowing a state system of regulation to function alongside of a federal system. In that field, any `concurrent state power that may exist is restricted to the narrowest of limits.' p. 68. Therefore, we were more ready to conclude that a federal Act in a field that touched international relations superseded state regulation than we were in those cases where a State was exercising its historic powers over such traditionally local matters as public safety and order and the use of streets and highways. Maurer v. Hamilton, [309 U.S. 598] supra, and cases cited. Here, we are dealing with the latter type of problem. We will not lightly infer that Congress by the mere passage of a federal Act has impaired the traditional sovereignty of the several States in that regard."
*556 In truth, when a State statute is assailed because of alleged conflict with a federal law, the same considerations of forbearance, the same regard for the lawmaking power of States, should guide the judicial judgment as when this Court is asked to declare a statute unconstitutional outright. The problem of conflict arises only when the States have power concurrent with Congress to legislate; to find conflict is merely a form of denying the power of legislation to the States. Except in rare instances, as already indicated, this Court has been extremely cautious in upsetting State regulation unless it has found that the regulation devised by Congress and that by which the State dealt with some local concern cannot, in a practical world, coexist. Only then has the Court been justified in holding that Congress has manifested its will to displace the constitutional authority of the State. To strike down a State law when that which a State requires does not truly hinder or obstruct federal regulation is unwarrantably to deprive the States of their constitutional power.
These are the principles which have been recognized and applied by the vast body of the decisions of this Court, and they are the principles that should determine the fate of the Florida legislation now here for judgment.
By legislation known as House Bill No. 142, Florida, in 1943, undertook to regulate labor unions and their officers. Laws of Florida, 1943, Ch. 21968, p. 565. That Act prohibits any person from acting as a "business agent" for any "labor organization" without having obtained a license. § 9 (6). In order to obtain such a license, for a fee of one dollar, a person must file with the Secretary of State an application under oath, accompanied by a statement showing the applicant's authority to act as business agent, vouched for by the president and secretary of the labor organization. To permit the filing of objections to granting the license, the application must be held on file for thirty days. Thereafter, the application, with all relevant *557 documents, goes to a Board composed of the Governor, the Secretary of State and the Superintendent of Education. On finding the applicant qualified, the Board must authorize the Secretary of State to issue a license for the calendar year. A license may not be issued to any person who has not been a citizen and resident of the United States for at least ten years, or who has been convicted of a felony, or who is not of good moral character. § 4. Another provision of the Act requires every "labor organization operating in the State of Florida" to file an annual report with the Secretary of State giving the name of the organization, the location of its office, the names and addresses of the president, secretary, treasurer and business agent. A filing fee of one dollar is required. § 6. A penal provision provides for fines not exceeding $500, or six months imprisonment, or both, for violation of the Act by any person or labor organization. § 14.
The Attorney General of Florida sought and obtained from a Florida Circuit Court an injunction forbidding the petitioner, United Association of Journeymen Plumbers and Steamfitters, Local No. 234, from functioning as a labor union until it had complied with the requirements of § 6, and forbidding petitioner Hill from acting as business agent for the Association until he had procured the license required by § 4. The Supreme Court of Florida affirmed the injunction. 19 So.2d 857. This Court reverses the Florida decision by concluding that the National Labor Relations Act, familiarly known as the Wagner Act, 49 Stat. 449, 29 U.S.C. § 151 et seq., debarred Florida from dealing with the matters with which her legislation dealt.
The Court reaches this conclusion rather summarily, as though the conflict between the Wagner Act and the Florida Act is too obvious for argument. Considering the fact that this case involves what so often has been *558 characterized as the most delicate function of this Court, that of invalidating legislation, the issue cannot be disposed of so easily.
While employer-employee relations on railroads have been the subject of Congressional legislation for more than half a century, giving rise to a more and more comprehensive scheme of federal regulation, as to such relations in industry generally Congress abstained from regulation until 1935. Its first essay in this field was professedly very limited in scope. Not content with setting forth the central aim of the Wagner Act in the legislative reports, Congress in the Act itself defined its purposes. In view of the inequality between organized employers and employees devoid of "full freedom of association or actual liberty of contract," and of the "denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining," it was "declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." § 1. To that end § 8, the heart of the Act, enumerated conduct by employers which the National Labor Relations Board was established to prevent. § 10. It is an accurate summary of the Wagner Act to say that it aimed to equalize bargaining power between industrial employees and their employers by putting federal law behind the employees' right of association. The whole plan or scheme of the Wagner Act was to enable employees to bargain on a fair basis, freed from "restraint or coercion *559 by their employer" through the protection given by the federal government. Labor Board v. Jones & Laughlin, 301 U.S. 1, 33.
All proposals to make of the Wagner Act a more comprehensive industrial code, by dealing with the conduct of employees and their unions, were rejected. The rights Congress created, the obligations it defined, the machinery it devised for enforcing these rights and securing obedience to these obligations, all were exclusively concerned with putting the strength of the Government against this conduct by employers. All other aspects of industrial relations were left untouched by the Wagner Act, and purposely so. All activities or aspects of labor organizations outside of their right to be free from employer coercion were left wholly unregulated by that Act. Neither expressly nor by indirection did the Wagner Act displace whatever police power the States may have to deal with those aspects of the life of a trade union as to which Congress, with eyes wide open, refused to legislate. When Congress purposely dealt only with the employer aspect of industrial relations and purposely abstained from making any rules touching union activities, the internal affairs of unions, or the responsibility of union officials to union members and to the public, Congress certainly did not sponge out the States' police power as to these matters. It wipes out State power and distorts Congressional intention to disregard the limited policy explicitly set forth by Congress. That policy  curbing of employer interferences with union rights  was scrupulously observed by Congress in the substantive provisions as well as in the enforcement structure of the Act. There is not a breath in the Act referring to any aspect of union activity unrelated to employer interference therewith. By refusing to legislate beyond that, Congress did not forbid the States from so legislating.
If Congress tomorrow chose to subject labor organizations and their officers to regulations similar to those dealt *560 with in the Florida law, it could hardly be suggested that the Wagner Act, as it now stands, already covers these subjects. Specifically, if Congress were to make certain requirements for the filing of reports by labor organizations that seek to avail themselves of the rights defined by the Wagner Act, and also were to devise a system of identification and licensing of authorized representatives of the unions, one would be hard put to it to find anything in the Wagner Act to prove that it had already dealt with these matters. Congress may well believe that there is such a difference in local circumstances as to make it desirable to leave treatment of these matters to the different localities. In any event, since these subjects are outside of the Wagner Act for purposes of making additions by federal law, they cannot be inside it to justify nullification of the Florida law. Whether the interests of union members or of outsiders call for an identification and licensing system for men discharging the responsibilities of business agents, it is not for us to determine. The only issue before us is whether Florida is free to deal with these matters when Congress has not done so. To repeat what was said in Allen-Bradley Local v. Board, supra, "We will not lightly infer that Congress by the mere passage of a federal Act"  this very Act  "has impaired the traditional sovereignty of the several States" over such police matters as are the concern of the Florida legislation.
If the Wagner Act has left Florida free to deal with these matters, Florida may not only legislate but also provide for enforcement of its legislation. In other words, if Florida may call for reports and require business agents to apply for licenses, of course Florida may provide appropriate sanctions for such regulations. If a union may properly be required to file a report and does not do so and therefore is prohibited from pursuing its industrial activities until it does file such a report, the State is not interfering with whatever rights the union may have *561 under the Wagner Act. It will be time enough to consider such a claim of conflict, if anything that Florida may exact should, in a concrete situation, actively interfere with appropriate action by the National Labor Relations Board. In any event, we do not know the reach of the Florida Act. For all that appears the Supreme Court of Florida may construe the Act's requirements to apply only to intrastate activities of the union and its business agents.
The judgment should be affirmed.
MR. JUSTICE ROBERTS concurs in this dissent.
NOTES
[1] House Bill No. 142, Laws of Florida, 1943, Chap. 21968, 565.
[2] The National Labor Relations Act applies only to activities which affect interstate commerce. Labor Board v. Jones & Laughlin Corp., 301 U.S. 1, 29, 30. The original bill for an injunction prayed that this union might be restrained from functioning as a union in connection with employees of the St. Johns River Shipbuilding Co. of Jacksonville, Florida, which company has been held by the Labor Board to be engaged in interstate commerce and subject to the Federal Act. Matter of St. Johns River Shipbuilding Co., 52 N.L.R.B. 12; 52 N.L.R.B. 958; 55 N.L.R.B. 1451; 59 N.L.R.B. No. 83; 60 N.L.R.B. No. 55. The case was submitted on the pleadings, which assume that interstate commerce questions were involved. The Supreme Court of Florida so treated the case in holding that there was no constitutionally prohibited conflict between the Florida and Federal Acts.