### FRAZIER, et al v. HENDERSON, Sheriff.

Circuit Court, Dade County.
March 10, 1952.

Richard H. M. Swann, Heaton & Snowden of counsel, all of Miami, for petitioners.

Glenn C. Mincer, State Attorney, S. O. Carson, Assistant State's Attorney, Robert R. Taylor, County Solicitor, John M. Boyer, Acting County Solicitor, for respondent.

GRADY L. CRAWFORD, Circuit Judge.

The question of the constitutionality of chapter 453, Florida Statutes 1951, is here presented to the court.

W. O. Frazier, president of the Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, Div. 1267, Dade County (hereinafter referred to as "the union") and D. Q. Lee, a member of the union and an employee of the Miami Transit Co., were arrested and held in custody under indictments and/or informations and warrants charging and accusing petitioners with violation of chapter 23911, 1947 Laws—section 453, Florida Statutes 1951.

Frazier and Lee filed petitions for writs of habeas corpus attacking the constitutionality of the law which they were charged with violating. Writs were issued and the validity of chapter 453, Florida Statutes 1951, known as the Public Utility Arbitration Law, was put in issue by motions to quash the writs and returns to the writs by the respondent sheriff, and by a motion for the discharge of petitioners notwithstanding the return.

Each original petition contained as an attachment an "Affidavit of Fact" setting up a factual resume of a labor dispute between the union and the Miami Transit Co. and the Miami Beach Railway Co. (hereinafter collectively referred to as "the company") resulting in the company petitioning the Governor of Florida to call into effect the arbitration and conciliation provisions of the challenged Act and further resulting in the union strike. Respondent filed a motion to strike the supporting affidavits, which the court denied.

A hearing took place during which a "Stipulation of Fact as to Effect on Interstate Commerce" was introduced. Petitioners presented testimony tending to prove that the company is engaged in a business which affects interstate commerce—and other facts set out in their affidavits. Respondents offered no testimony.

The arrests of the petitioners were made for violations of the provisions of chapter 453, Florida Statutes 1951, under section 453.12 of the Act. The Act provides in section 453.04 that:

> If in any case of a labor dispute between a public utility employer and its employees, the collective bargaining process reaches an impasse and stalemate, with the result that the employer and the employees are unable to effect a settlement thereof, then either party to the dispute may petition the Governor of the State of Florida to appoint a conciliator . . . Upon the filing of such petition, the Governor shall consider the same, and if he deems advisable shall order a hearing thereon, and if in his opinion the collective bargaining process, notwithstanding good faith efforts on part of both sides to such dispute, has reached an impasse and stalemate and such dispute if not settled, will cause or is likely to cause the interruption of the supply of a service on which the community affected is so dependent that severe hardships would be inflicted on a substantial number of persons by a cessation of such service, the Governor shall appoint a conciliator to attempt to effect the settlement of such dispute.

Interruption of work is prohibited by section 453.05 of the Act, which reads:

> . . . From and after the filing of a petition with the Governor as provided for in 453.04 hereof, and until and unless the Governor shall determine that the failure to settle the dispute with respect to which such petition relates would not cause severe hardship to be inflicted on a substantial number of persons, there shall be no interruption of work and no strikes or slowdowns by the employees, and there shall be no lockout or other work stoppage by the employer, until such time as all procedure provided for by this chapter has been exhausted or during the effective period of any order issued by a board of arbitration pursuant to the provisions of this chapter.

This provision is part of a statutory pattern designed to become effective whenever collective bargaining results in an "impasse and stalemate" likely to cause interruption of the supply of "a service on which the community affected is so dependent that severe hardship would be inflicted on a substantial number of persons by a cessation of such service" (sec. 453.04, Florida Statutes 1951) — that service including electric power, light, heat, gas, water, communication or transportation services (453.02). Whenever such an impasse occurs the Governor is empowered to appoint a conciliator to meet with the parties in an effort to settle the dispute (453.04). In the event of a failure of conciliation, the Governor is directed to "appoint a board of arbitration to hear and determine such dispute" (453.06). The Act establishes standards to govern the decision of the arbitrators (453.07, 08), and provides that the order of the arbitrators shall "become binding upon, and shall

control the relationship between the parties" (453.09), subject to judicial review (453.10, 11). In summary, the Act substitutes arbitration upon order of the Governor for collective bargaining whenever an impasse is reached in the bargaining process. And, to assure conformity with the statutory scheme, Florida denies the public utility employees the right to strike.

In the instant case petitioners refused to recognize the conciliation and arbitration machinery provided for by the Act and set in motion by the Governor at the request of the company. The union, however, continued to arbitrate up to and during the strike and representatives of the Federal Conciliation and Mediator's Service were engaged in attempting to settle the dispute when the State Act was invoked.

In attacking the constitutionality of chapter 453 petitioners contend the Florida law conflicts with federal legislation enacted under the commerce clause of the federal constitution (Art. 1, Sec. 8) in that the National Labor Relations Act, as amended by the Labor Management Relations Act, completely preempts the field of regulation of peaceful strikes affecting interstate commerce so that no concurrent regulation by the states is permitted. They contend the Act attempts to exercise regulation over peaceful strikes for higher wages in the field of public utilities and that such strikes are exclusively subject to federal regulation. Further, that the Act prohibits peaceful picketing and otherwise violates the provisions of the 1st and 14th amendments to the federal constitution and the constitution and laws of Florida, and that the Act imposes involuntary servitude and violates the 13th amendment of the federal constitution and the constitution and laws of Florida.

Respondent denies that the Act violates any provisions of the federal or state constitutions and that the Act conflicts with any federal law embracing the same subject matter. He asserts that the Florida law is a valid exercise of the state's police power, that its provisions come within the emergency clause of the federal law embracing the same subject—constituting a field of legislation not preempted by the federal government.

This case seems to fall squarely within the purview of the recent decision of the United States Supreme Court handed down on February 26, 1951 in Amalgamated Ass'n. of Street, Electric Railway & Motor Coach Employees of America, Div. 998, et al v. Wisconsin Employment Relations Board, 340 U. S. 383, 95 L. Ed. 364, 71 S. Ct. 359. In that case the Supreme Court

held invalid a Wisconsin act attempting to regulate public utilities. The Florida Act involved here would almost seem to have been based on the Wisconsin act (chapter 111.50, Wisconsin statutes 1949) the pertinent sections of each act are so similar. The question presented to the federal supreme court in the Wisconsin case is identical to that presented here.

The Supreme Court in the Wisconsin case, speaking through Mr. Chief Justice Vinson, said at page 389:

> We have recently examined the extent to which Congress has regulated peaceful strikes for higher wages in industries affecting commerce. International Union of United Auto Workers v. O'Brien, 1950, 339 U. S. 454. We noted that Congress in § 7 of the National Labor Relations Act of 1935, as amended by the Labor Management Relations Act of 1947, expressly safeguarded for employees in such industries the "right * * * to engage in * * * concerted activities for the purpose of collective bargaining or other mutual aid or protection," "e.g., to strike." We also listed the qualifications and regulations which Congress itself has imposed upon its guarantee of the right to strike, including requirements that notice be given prior to any strike upon termination of a contract, prohibitions on strikes for certain objectives declared unlawful by Congress, and special procedures for certain strikes which might create national emergencies. Upon review of these federal legislative provisions, we held, 339 U.S. at page 457:

> "None of these sections can be read as permitting concurrent state regulation of peaceful strikes for higher wages. Congress occupied this field and closed it to state regulation. Plankinton Packing Co. v. Wisconsin Board, 1950, 338 U. S. 953; LaCrosse Telephone Corp. v. Wisconsin Board, 1949, 336 U. S. 18; Bethlehem Steel Co. v. New York Labor Board, 1947, 330 U. S. 767; Hill v. State of Florida ex rel. Watson, 1945, 325 U.S. 538."

In the Wisconsin case a distinction was attempted to be drawn between the facts in that case and the facts in International Union of United Auto Workers v. O'Brien, supra, on the ground that the O'Brien case concerned a national manufacturing concern, not a local public utility as in the Wisconsin case and here.

The Supreme Court said at page 391:

> Congress drew no such distinction but, instead, saw fit to regulate labor relations to the full extent of its constitutional power under the commerce clause, National Labor Board v. Fainblatt, 1939, 306 U.S. 601, 607. Ever since the question was fully argued and decided in Consolidated Edison Co. v. National Labor Board, 1938, 305 U.S. 197, it has been clear that federal labor legislation, encompassing as it does all industries "affecting commerce", applies to a privately owned public utility whose business and activities are carried on wholly within a single state. The courts of appeal have uniformly held enterprises similar to and no more important to interstate commerce than the Milwaukee gas and transit companies before us in these cases subject

to the provisions of the federal labor law. No distinction between public utilities and national manufacturing organizations has been drawn in the administration of the Federal Act, and, when separate treatment for public utilities was urged upon Congress in 1947, the suggested differentiation was expressly rejected. Creation of a special classification for public utilities is for Congress, not for this Court.

Respondent here contends that chapter 453, Florida Statutes 1951, comes within the emergency clause of federal legislation embracing the same subject—and thus constitutes a field of legislation not preempted by the federal government. The same contention was made in the Wisconsin case, and the Supreme Court in disposing of it said at page 393:

As we have noted, in 1947 Congress enacted special procedures to deal with strikes which might create national emergencies. Respondents rely upon that action as showing a congressional intent to carve out a separate field of "emergency" labor disputes and, pointing to the fact that Congress acted only in respect to "national emergencies", respondents ask us to hold that Congress intended, by silence, to leave the states free to regulate "local emergency" disputes. However, the Wisconsin Act before us is not "emergency" legislation but a comprehensive code for the settlement of labor disputes between public-utility employers and employees. Far from being limited to "local emergencies", the act has been applied to disputes national in scope, and application of the act does not require the existence of an "emergency". In any event, congressional imposition of certain restrictions on petitioners' right to strike, far from supporting the Wisconsin Act, shows that Congress has closed to state regulation the field of peaceful strikes in industries affecting commerce. United Auto Workers v. O'Brien, supra, 339 U.S. at page 457. And where, as here, the state seeks to deny entirely a federally guaranteed right which Congress itself restricted only to a limited extent in case of national emergencies, however serious, it is manifest that the state legislation is in conflict with federal law.

Like a majority strike vote provision considered in O'Brien, a proposal that the right to strike be denied, together with the substitution of compulsory arbitration in cases of "public emergencies," local or national, was before Congress in 1947. This proposal, closely resembling the pattern of the Wisconsin Act, was rejected by Congress as being inconsistent with its policy in respect to enterprises covered by the Federal Act, and not because of any desire to leave the states free to adopt it. Michigan, in O'Brien, sought to impose conditions on the right to strike and now Wisconsin seeks to abrogate that right altogether insofar as petitioners are concerned. Such state legislation must yield as conflicting with the exercise of federally protected labor rights.

The Supreme Court found the Wisconsin Act in conflict with the National Labor Relations Act of 1935 and the Labor Management Relations Act of 1947, passed by Congress pursuant to its powers under the commerce clause of the federal con-

stitution. The same conflicts exist between chapter 453 and the federal law. In this case the union agreed to continue collective bargaining even after the strike had been called and was in progress, whereas the company invoked the compulsory conciliation and arbitration features of the state law. Our Act like the Wisconsin Act requires that collective bargaining continue until an impasse is reached (Fla. 453.04—Wis. 111.52), whereas the federal law requires that both employer and employees continue to bargain collectively even though a strike may be in progress. National Labor Relations Board v. MacKay Radio & Tel. Co., 1938, 304 U.S. 333, 345, 82 L. Ed. 1381, 1389, 58 S. Ct. 904. Our Act like the Wisconsin Act forbids peaceful strikes for higher wages *in industries covered by the federal law* and has thereby forbidden the exercise of rights protected by art. 7 of the federal law. Thus our Act is in direct conflict with the federal law.

Respondent here argues the importance of the transit service to the community and urges that predominantly local problems are best left to local governmental authority for solution. On the other hand petitioners argue that prohibition of strikes with reliance on compulsory arbitration for ultimate solution of labor disputes destroys the free collective bargaining declared by Congress to be the bulwark of the national labor policy. This, it is said, leads to more labor unrest and disruption of service than is now experienced under a system of free collective bargaining accompanied by the right to strike.

In the words of the United States Supreme Court at page 397:

The very nature of the debatable policy questions raised by these contentions convinces us that they cannot properly be resolved by the Court. In our view, these questions are for legislative determination and have been resolved by Congress adversely to respondents.

When it amended the Federal Act in 1947, Congress was not only cognizant of the policy questions that have been argued before us in these cases, but it was also well aware of the problems in balancing state-federal relationships which its 1935 legislation had raised. The legislative history of the 1947 Act refers to the decision of this Court in Bethlehem Steel Co. v. New York Labor Board, 1947, 330 U. S. 767, and, in its handling of the problems presented by that case, Congress demonstrated that it knew how to cede jurisdiction to the states. Congress knew full well that its labor legislation "preempts the field that the act covers insofar as commerce within the meaning of the act is concerned" and demonstrated its ability to spell out with particularity those areas in which it desired state regulation to be operative. This Court, in the exercise of its judicial function, must take the comprehensive and valid federal legislation as enacted and declare invalid state regulation which impinges on that legislation.

In the instant case it is not disputed that the union is the collective bargaining representative of all the employees of the company. It was shown that the National Labor Relations Board exercised jurisdiction over the company and its employees in conducting elections to determine the collective bargaining representative. It was shown that the union continued to arbitrate up to and during the strike and that representatives of the Federal Conciliation and Mediator's Service had been called in and were engaged in attempting to settle the dispute. There was ample showing made that the company was engaged in a business which affects interstate commerce.

It is the court's opinion that the case is governed by the decision of the federal supreme court in the Wisconsin case, supra, and chapter 453, Florida Statutes 1951, must be declared invalid. There is a strong and well-reasoned dissenting opinion in the federal supreme court case—but this court is bound by the majority opinion and decision.

Accordingly, the motions to quash the writs are denied, and it appearing from the petitions, returns and other pleadings that the Act is unconstitutional, petitioners are discharged.