ALBERTSON et al. v. MILLARD, Atty. Gen. of Michigan, et al.

Civ. A. 11623.

United States District Court
E. D. Michigan, S. D.

July 30, 1952.

Levin, J., dissented.

Frank G. Millard, Atty. Gen. of Michigan, Edmund E. Shepherd, Sol. Gen., Detroit, Mich., Daniel J. O'Hara and Ben H. Cole, Asst. Attys. Gen., for defendants.

Lewis, Rowlette, Brown and Bell, Joseph A. Brown, Goodman, Crockett, Eden & Robb and Ernest Goodman, Detroit, Mich., for plaintiffs.

Before SIMONS, Chief Circuit Judge, and PICARD and LEVIN, District Judges.

SIMONS, Chief Judge.

The numerous constitutional questions raised by the bill of complaint pose the problem, whether the Legislature of Michigan, recognizing a substantial threat to the very existence of state and national governments, in the activities of the Communist Party of Michigan, may protect itself against it, ·by condemning the infiltration of its members into private and public employment, and into the public schools of the state, curtailing its subversive propaganda and advocacy of the overthrow of government by force or violence, when the Congress of the United States has already legislated with identical or related purpose. The solution of the problem involves the question, whether the Constitution of the United States by its carefully designed guaranties of individual liberty and due process has so tied the hands of the state that it may not take effective steps to avert this threat to ordered liberty in a time of great national crisis.

The bill of complaint assails the constitutionality in various aspects of the so-called Trucks Act, No. 117 Mich.Pub.Acts 1952, approved by the Governor of Michigan April 17, 1952, and given immediate effect. It seeks an injunction restraining state and local authority from enforcing §§ 4, 5, 7, of the Act, an adjudication that such sections are invalid and unconstitutional on their face, and in their intended application to the complainants, and such other relief as equity may require. A temporary restraining order issued. The defendants, responding to an order to show cause, deny the material allegations of the bill and a 3-judge court was constituted to hear and decide the petition for injunction, as required by Federal statute. Constitutional issues were fully argued and ably briefed with commendable restraint and in reliance upon reason and precedent.

Prior to the enactment of the Trucks Act, the people of Michigan amended § 22 of Article II of the State Constitution by defining subversion to "consist of any act, or advocacy of any act, intended to overthrow the form of government of the United States or the form of government of this state * * * by force or violence or by any unlawful means", Pub.Acts 1950, Ex.Sess., p. 133, declared subversion to be a crime punishable by any penalty provided by law, and to constitute an abuse of the rights secured by § 4 of Art. II, which prohibits the passage of any law abridging liberty of speech or of the press. Following the adoption of the amendment, the Legislature enacted Public Act No. 38 of the Public Acts of 1950, Cum.Supp. § 28.243(1) et seq., the "Little Smith Act", creating the crime of subversion and providing penalties therefor. That Act is not by these

proceedings assailed but may be indirectly involved.

Of the sections of the Trucks Act specifically challenged as unconstitutional, § 4 defines a "communist front organization" as one whose members are not all Communists but which is substantially directed, dominated or controlled by Communists or by the Communist Party, or which in any manner advocates or acts to further the World Communist Movement and the Attorney General is authorized to prepare and cause to be published a list of all such organizations. Section 5(a) requires that each person remaining in the State for five consecutive days after the effective date of the Act, who is a communist and knowingly a member of a communist front organization, register with the State Police under oath and give pertinent information of the purpose of his presence within the State, features of identification, and other data. It also requires officers of the Communist Party and those of communist front organizations to register and disclose the location of their offices and meeting places, names of their members, financial statements reflecting receipts and disbursements, and other data, within thirty days after the effective date of the Act and imposes criminal penalties for failure to comply. Section 7 of the Act provides that the name of any communist or any nominee of the Communist Party shall not be printed upon any ballot used in any primary or general election in the state or in any political subdivision thereof.

■ At the very outset, we are confronted with the question, as to which, if any, of the cited provisions of the Trucks Act are brought into issue by the named plaintiffs. It has repeatedly been held that "one who would strike down a state statute as violative of the federal Constitution must show that he is within the class of persons with respect to whom the act is unconstitutional and that the alleged unconstitutional feature injures him." Heald v. District of Columbia, 259 U.S. 114, 123, 42 S.Ct. 434, 435, 66 L.Ed. 852 (Opinion of Mr. Justice Brandeis). To the same effect is Com. of Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L. Ed. 1078, where it was said: "The party who invokes the power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." To hold otherwise "would be, not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and coequal department, an authority which plainly we do not possess."

■ This being the limitation upon our power to adjudicate constitutional questions, we look to the parties-plaintiff. They are Albertson and the Communist Party of Michigan. Albertson sues in his own right and as representative of the Communist Party, of which he is the secretary. Albertson does not disclose the authority of the governing body of the party to sue in its name. He does not claim to represent organizations that are merely communist fronts. He represents but a party whose members are all communists. Our conclusion is that no communist front organization is party to this suit, and that all provisions affectng communist front organizations or foreign communists who may come into the state, are not presently challenging the constitutional validity of the Act, and that all provisions relating to them must be disregarded and the bill as to them dismissed.

Joint Anti-Fascist Refugee Committee v. McGrath, Attorney General, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817, has no bearing upon the present problem. There, the organizations which complained of the classification by the Attorney General of the United States expressly denied that they were within it. They presented a controversy which could be adjudicated under the constitutional grant of judicial power. Here, are no organizations claiming relief from classification as communists. The parties-plaintiff proclaim themselves communists. There may be provisions in the Trucks Act which raise grave constitutional questions. They are not here at the prayer of parties qualified to challenge.

■■ The justiciable issues that remain are those in respect to the provisions of Section 5 of the assailed Act, which requires communists (as distinguished from members of communist front organizations) to register with the Michigan State Police. and to furnish information as to communist organizations, and Section 7 which forbids the name of any communist or of any nominee of the Communist Party to be printed upon the ballot used in any primary or general election in the state, or in any political subdivision thereof. As in all cases where the strong arm of equity is sought by way of injunction, consideration must be given to whether enforcement of the statute will cause irreparable injury. If the Communist Party and its members are what the bill of complaint says they are, and seek only to enhance and secure the general social and economic welfare of the American people and provide protection for their civil rights and liberty, and if registration of its members would subject them to the penal provisions of the Little Smith Act and other statutes; would make them social outcasts and informers, then, of course, the bill sufficiently alleges that irreparable injury will be suffered by enforcement of the Act. It is no answer to this contention that the Communist Party has not appeared upon the ballot in Michigan since 1946. Political parties have on occasions sprung from small groups, and have been reactivated after lying dormant. This is not to say, however, that in the face of legislative findings and public knowledge the allegations of the bill in this respect must be taken as conclusive, and detailed consideration will follow.

■ Our attention at this point must be given to the contention that the Trucks Act is invalid because the Congress by the Internal Security Act of 1950, Public Law 831, the McCarran Act, 50 U.S.C.A. § 781 et seq., completely "occupies the field", to the exclusion of the exercise of state authority. We have been cautioned in Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581, that in considering the validity of state laws in the light of treaties, or Federal laws touching the same subject; expressions "conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference" do not provide an infallible constitutional test or an exclusive constitutional yardstick. "In the final analysis, there can be no one crystal clear distinctly marked formula."

Plaintiffs rely, principally, on Bethlehem Steel Company v. New York State Labor Relations Board, 330 U.S. 767, 67 S.Ct. 1026, 1030, 91 L.Ed. 1234 and United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796. In the Bethlehem case, challenge was to the validity of a state law which was held to be in conflict with the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and it was there said that "power of the state may not so deal with matters left to its control as to stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of the Congress'," citing Hill v. Florida, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782. The court recognized, however, 330 U.S. at page 774, 67 S.Ct. 1026, that if the measure in question relates to what may be considered a separable or distinct segment of the field covered by the federal statute, the case will be treated in a manner similar to cases in which the effectiveness of federal supervision awaits federal administrative regulations. The concurring opinion in that case of Justices Frankfurter, Murphy and Rutledge points out that, in legislating, Congress is not indulging in doctrinaire, hard and fast curtailment of state powers reflecting special interest and that any indulgence in construction should be in favor of the states and that for an Act of Congress completely to displace a state law, the repugnance or conflict should be direct and positive so that the two Acts cannot be reconciled or consistently stand together. In the Pink case, it was observed that the field of international relations is one aspect of the Government that, from the first, has been most generally conceded imperatively to demand broad national authority.

■ Our consideration of these rationalizations leads us to the view (1) that where Congress enters a field of regulation, but does not occupy it entirely, the state

is not precluded from legislating therein in matters of purely state concern, (2) that exclusion of the exercise of state authority is to be enforced only where state action conflicts, or is likely to conflict, with federal authority and does not apply where state legislation is complementary to the purpose and objectives of federal action, (3) that the exclusion principle is to be more strictly applied when the Congress acts in a field wherein the constitutional grant of power to the federal government is exclusive, as in its right to protect interstate commerce and to control international relations.

■ With this view we consider the present state enactment. Insofar as it seeks to regulate those persons who may be nominated for state or local office, or may be employed by the states, such regulation is entirely out of the sphere of federal power if state legislation is not unreasonable or arbitrary and does not offend due process. The mere fact that domination of a state political party by a foreign government is used as a test in determining its communist character is not in any sense an effort to regulate foreign relations. It is a test applied to citizens of the state and affecting no legitimate foreign interests. Insofar as the objectives of the Trucks Act and the McCarran Act are identical, there is no conflict or reasonable probability of conflict. Both have for their purpose the curtailment of activities recognized as subversive and inimical to democratic government. They are complementary to each other, one on the national and the other upon the local level.

■ In a major aspect of the problem, it has unequivocally been held in Dennis v. U. S., 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, that it is within the power of the Congress to protect the Government of the United States from armed rebellion where the existing structure of the government provides for peaceful and orderly change and the principle of governmental helplessness in the face of preparation for revolution is categorically rejected. It must follow that the states, in their sovereign capacity, have not only like power but an equal obligation to prohibit acts

intended to overthrow their governments by force and violence, if the means employed are reasonable. This is the teaching of Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, approved and relied upon in Dennis, 341 U.S. 506, 71 S.Ct. 857. The states will no longer exist if the federal government is overthrown, just as the government will perish if the states are destroyed. Moreover, the states are the first line of defense and, if sabotage and revolution strike, reason and judgment counsel that they will as likely strike at great industrial centers, such as are contained in Michigan, as at the seat of government itself. The state cannot be helpless in seeking to avert catastrophe. The Trucks Act is not invalid merely because of the McCarran enactment.

■ Finally, it has always been considered important, in determining whether a state act is to stand in the face of a federal statute, whether the Congress has indicated its purpose to deal exclusively with the subject-matter. There is no express indication of such purpose in the McCarran Act, and its legislative history clearly indicates that it had no such purpose. In reporting the Bill to the Senate, the Senate Committee on un-American activities (Sen.Rep.No. 2369, August 17, 1950) recited that it had given serious consideration to many well-intentioned proposals which were before it which attempted to meet the problem of outlawing the Communist Party. Some wanted to bar the Communist Party from the ballot in elections, others would have made membership in the Communist Party illegal *per se*. "The committee believes that there are several compelling arguments against the outlawing approach. There are grave constitutional questions involved in attempting to interfere with the rights of the state to declare what parties and individuals may qualify for appearance on the ballot", and, again, in its conclusion, the committee stated: "The committee wishes to emphasize that this legislation alone is not a complete answer to the communist problem in the United States. An attack must be made on the communist problem on all fronts if we are to meet it successfully." In

642

the House Committee debates, there were many members who wished to extend the McCarran Bill to any government in the United States. An amendment to that effect was offered by Mr. Bennett of Florida (Cong.Rec. Aug. 29, 1950, p. 13762). The Chairman ruled that the bill before the committee dealt only with the federal government, so that he was constrained to rule that the amendment was not germane to the bill. There was no appeal.

■ The precise question with which we are concerned, as was the Supreme Court in Dennis v. U. S., supra, and American Communications Association v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925, is not, whether the state has such power, but whether the means which it has employed conflict with the First and Fifth Amendments to the Constitution and the due process clause of the Fourteenth Amendment. It may at once be conceded, without the necessity of citing authority, that the state has no power, ordinarily, to arbitrarily refuse any political party which has complied with all reasonable election laws of the state a place upon the ballot either in state or federal elections. But there is inexorably implicit in this doctrine, that an organization which denominates itself a political party has for its objectives a legal and not an illegal purpose. So interpreted, the doctrine would extend even to a party which espouses a communistic form of government to be achieved by peaceful means within the framework of the Constitution and by resort to reasoning and persuasion. It then becomes necessary to determine whether the legislature, acting on such information as was available to it and by it deemed to be authoritative, had found the Communist Party of Michigan other than a political party, in the usual and historical sense. Let it be made clear that what we have to determine here is not, whether the Communist Party of Michigan is or is not a political party but whether the legislature was justified in determining it to be something else, inimical to the existence of the state and to a democratic form of government. As Mr. Justice Frankfurter said in concurring in the Dennis case [341 U.S. 494, 71 S.Ct. 875]: "We are to set aside the judgment of those whose duty it is to legislate only if there is no reasonable basis for it. In re Sinking-Fund Cases, 99 U.S. 700, 718, 25 L.Ed. 496 [504]; Mugler v. Kansas, 123 U.S. 623, 660-661, 8 S.Ct. 273, 296, 297, 31 L.Ed. 205; United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234."

■ The legislature of Michigan found and declared that there are present in the state of Michigan subversive groups and elements, particularly of the Communist Party. It has been held that, Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may be made the subject of judicial inquiry. Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281. "In cases where the validity of a statute is attacked for want of due process, * * * the court is asking not whether the social facts support the statute, but only whether the legislature has reasonable grounds for believing that they do? On this issue, the court considers such data as reports of legislative committees, investigating commissions, and administrative bureaus, compilations of legislation in the various states and countries, encyclopedias, dictionaries, and scientific books and articles. In this context when the courts state that they take judicial notice of such writing, they mean merely that they take notice that such sources are authentic and sufficiently reliable for the legislature to give weight to their statements, not that they take notice of the truth of the statements." McCormick, on Judicial Notice, Vol. 5 No. 3, Vanderbilt Law Review, April 1952.

It was conceded, upon argument, that the Michigan Communist Party is associated with the Communist Party of the United States. That the Communist Party of the United States is part of a world communist movement needs little demonstration, in view of its fluctuating policy in consonance with the shifting policy of the Soviet Government during the late war. That the Communist Party of the United States advocates the overthrow of democratic governments, including that of the United

States and its states, is supported by a superabundance of credible evidence, and the present plaintiffs do not disavow its objectives or procedures. The works of Marx, Lenin and Stalin have been said to be the "Bible of Communism". The testimony in the Dennis case demonstrated clearly not only that Communism is a world movement but that the leaders of the Communist Party advocated the overthrow of the American Governments by force and violence. A study made by the American Bar Association which resulted in the adoption of its resolution to expel from its membership lawyers who are members of the Communist Party recites, with great particularity, its purposes and objectives, which include the overthrow of democracies by force, including our own. Many who joined it in high idealism, but left it in complete disillusionment, have voiced the same view, and practically all publicists who have studied its activities in America are in accord.

In American Communications Association v. Douds, supra, 339 U.S. 391, 70 S.Ct. 680, the Chief Justice, speaking for a court which upheld the non-communist oath provision of the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., observed: "the fact that the statute identifies persons by their political affiliations and beliefs, which are circumstances ordinarily irrelevant to permissible subjects of government action, does not lead to the conclusion that such circumstances are never relevant." "Congress might reasonably find, however, [339 U.S. at page 393, 70 S.Ct., at page 681] that Communists, unlike members of other political parties, and persons who believe in overthrow of the Government by force, unlike persons of other beliefs, represent a continuing danger of disruptive political strikes when they hold positions of union leadership." Speaking of the First Amendment, (339 U.S. at page 394, 70 S.Ct. at page 682) providing that Congress shall make no law abridging freedom of speech, press, or assembly, he observed: "It has long been established that those freedoms are dependent upon the power of constitutional government to survive. If it is to survive, it must have power to protect itself against unlawful conduct and, under some circumstances,

against incitements to commit unlawful acts."

Mr. Justice Jackson, concurring, went further, pointing to the decisive differences between the Communist Party and every other party of any importance in the long experience of the United States with party government. Recognizing that the Communist Party is different, in fact, from any other substantial party, he asserted that constitutionally it may be treated as "something different in law." "From facts of general knowledge, Congress could rationally conclude that, behind its political party facade, the Communist Party is a conspiratorial and revolutionary junta, organized to reach ends and to use methods which are incompatible with our constitutional system." He listed numerous distinctions. Its goal is to seize powers of government by and for a minority. It alone is dominated and controlled by a foreign government. Every member is an agent to execute its program. The party is a secret conclave whose members are admitted only after indoctrinization in its policies, with deviation from the party-line calling for purges and exclusions.

In Dennis v. United States, supra, [341 U.S. 494, 71 S.Ct. 861, 95 L.Ed. 1137] the Chief Justice accepted the findings of the Second Circuit Court of Appeals, U. S. v. Dennis, 183 F.2d 201, that "the Communist Party is a highly disciplined organization, adept at infiltration into strategic positions, use of aliases, and double-meaning language; that the Party is rigidly controlled; that Communists, unlike other political parties, tolerate no dissension from the policy laid down by the guiding forces, but that the approved program is slavishly followed by members of the Party; that the literature of the Party and the statements and activities of its leaders * * * advocate, and the general goal of the Party was, during the period in question, to achieve a successful overthrow of the existing order by force and violence." Concurring, Mr. Justice Frankfurter concluded: "The Communist Party was not designed by these defendants as an ordinary political party. * * * It (the jury) found that the Party entertains and pro-

motes this veiw, not as a prophetic insight or as a bit of unworldly speculation, but as a program for winning adherence and as a policy to be translated into action." Mr. Justice Jackson, concurring in the same case, observed that "unless we are to hold our Government captive in a judge-made verbal trap, we must approach the problem of a well-organized, nation-wide conspiracy * * * The Communist Party realistically is a state within a state, an authoritarian dictatorship within a Republic."

We might continue, at great length, were we not circumscribed by time and the appropriate limits of an opinion. An organization so characterized is not beyond the power of regulation and control by a state sensitive to its danger. The state is not obligated to foster it by providing it with a soundingboard for the dissemination of subversive propaganda, at state expense. Albertson wishes to run for Congress on a Communist ticket. The state has no duty to permit him to do so when he may not, in good faith, take the statutory oath "to protect and defend the Constitution of the United States". The very essence of democratic government is freedom of choice and mistakes once made, may be corrected by the democratic process. Communist control brooks no such correction. Of these things, the legislature must have been made aware by the vast publicity given to communist objectives and procedures. How naive must a legislature be?

The main assault, however, upon the constitutionality of the Trucks Act is leveled at the registration provisions of Section 5. This, the plaintiffs say, is the heart of the Act, for, by registering, a person admits among other things that he is one who advocates the overthrow of the Government by force, violence, or other illegal means. On the other hand, if the Communist Party does register it will be required to list the names of its members, persons who attend its meetings, and the names of those from whom and to whom money is received or disbursed; that if Albertson registers, it would bring upon him obloquy and the hazards created by other state and federal statutes, and would invade his privilege against self-incrimina-

tion. But Albertson has already in this very proceeding declared, under oath, that he is the executive secretary of the Communist Party of the state of Michigan, and a Communist. Registration under the Trucks Act will add nothing to this for the right to be free from compulsion in this respect may and already has been waived. But, say the plaintiffs, for him to register under the Act would require information from him as to the records of the Communist Party of Michigan, its receipts, disbursements, and membership lists, all of which is tantamount to unreasonable search and seizures condemned by the Bill of Rights. It has never been thought constitutionally invalid to require parties or candidates to disclose the source of their funds or the extent of their expenditures, and it has been held in United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542, in an opinion by Mr. Justice Murphy, speaking for the entire court: "The privilege against self-incrimination is a purely personal one * * *. And the official records and documents of an organization that are held by them in a representative rather than in a personal capacity cannot be the subject of the personal privilege * * *. Such records and papers are not the private records of the individual members or officers of the organization." So, with the party itself. Either its governing body authorized Albertson to bring this suit in its behalf or it did not. If it did not, it is not here. If it did, and we assume it did, it has declared itself to be a communist organization and associated with the Communist Party of the United States and, by common knowledge, a factor in the World Communist Movement. Its officers and members, so far as known, have by this proceeding, likewise, waived the privilege against self-incrimination, if admission of communism is incriminating.

The Trucks Act is not a Bill of Attainder, American Communications Association v. Douds, supra, 339 U.S. at pages 413, 414, 70 S.Ct. 674. The plaintiffs are subject to possible loss of opportunity to seek election to public office only because there is substantial ground that their beliefs

and loyalties will be transformed into future conduct. The history of past or present conduct may be the foundation for judgment as to what that future conduct is likely to be. The registration provisions are intended to prevent future action rather than to punish past action.

■ The complaint enlarges upon the vagueness of the Act, in that it fails to set up a precise and understandable standard of conduct that is to be condemned. In U. S. v. Dennis, 2 Cir., 183 F.2d 201, 215, Judge Learned Hand reasoned, "When a statute is directed against conduct which offends accepted moral standards, and particularly when the moral offense is heinous, ambiguities do not count against its validity as much as they do when the prescribed conduct has no ethical significance, as, for instance, when it is only an economic regulation". This reasoning was accepted by the Supreme Court in Dennis v. U. S., supra, 341 U. S. at page 515, 71 S.Ct. at page 870: "We agree that the standard as defined is not a neat, mathematical formulary. Like all verbalizations it is subject to criticism on the score of indefiniteness. * * We think it well serves to indicate to those who would advocate constitutionally prohibited conduct that there is a line beyond which they may not go—a line which they, in full knowledge of what they intend and the circumstances in which their activity takes place, will well appreciate and understand."

■ At long last, we return to the basic problem, with which we began. We may frankly concede, that in another climate of world conditions, some of the contentions of invalidity might wear a different aspect. But when American democratic concepts are challenged by a totalitarian philosophy seeking world expansion, wedded to great physical power, and armed conflict may perhaps not be avoided, the presence in our midst of a highly disciplined subversive group, bent on spreading confusion and destruction, may spell the difference between security and internal chaos. The experience of East European peoples may not be ignored. Appraisal of the danger and choice of means to avert it, is a legislative and not a judicial function, so

long as procedures do not clearly invade constitutional guaranties of liberty, and abridgment is not perceived in the limited area of permissible adjudication.

■ There has been a growing appreciation of the necessity of finding ground for a rational compromise between individual rights and public welfare. Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 444, 54 S.Ct. 231, 242, 78 L.Ed. 413. "A proper occasion for the exercise of the reserved power of the state to protect the vital interests of the community" include (1) a finding of the existence of an emergency which cannot be regarded "as a subterfuge or as lacking in adequate basis", (2) legislation addressed to a legitimate end, (3) appropriate to the emergency, (4) and not unreasonable. Home Building & Loan Ass'n v. Blaisdell, supra, 290 U.S. 444, 54 S.Ct. 231. We are here concerned only with the question, whether the Act is unconstitutional on its face, and we may not assume that Michigan will deny to those accused of its violation, orderly procedures and constitutional due process.

■ There is no constitutional right to advocate the overthrow of government by force, and the over-riding power of government to protect its existence may not be successfully assailed. Mr. Justice Frankfurter in the Dennis case called it "the most pervasive aspect of sovereignty." [71 S.Ct. 872, 95 L.Ed. 1137] The Supreme Court in the Chinese Exclusion Case, (Chae Chan Ping v. U. S.) 130 U.S. 581, 606, 9 S.Ct. 623, 630, 32 L.Ed. 1068, observed "To preserve its independence, and give security against foreign aggression and encroachment, is the highest duty of every nation, and to attain these ends nearly all other considerations are to be subordinated." Realistically viewed, the Trucks Act, in the clauses here considered, is, in essence, an effort, crude and inept as it may in some aspects appear, to preserve a government with whose destruction all personal rights will disappear and freedom of choice in government vanish. Such is the inescapable lesson of recent European experience.

Injunction denied, the temporary restraining order dissolved, and the bill dismissed.

PICARD, District Judge (concurring).

I subscribe to Chief Judge Simons' very able opinion and although it completely answers all issues raised—particularly whether Congress has pre-empted the field of foreign relations—I desire to add but a word.

Briefly this is the situation as I view it:

. First: The plaintiff herein admits and proclaims he is a Communist and a member of the Communist Party of Michigan;

Second: The Communist Party of Michigan is affiliated with the Communist Party of the United States; and

Third: As proved and held in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, and determined by our own Michigan legislature, together with the great mass of evidence recently compiled, including declarations of those who have escaped Communist ideologies and resultant practices, the Communist Party of the United States has been adjudged, not a political association as such, but a world organization aimed to overthrow the government of the United States by force and violence. To admit being a member is incriminating. Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170; Alexander v. United States, 9 Cir., 181 F.2d 480. And our legislature had ample evidence to support its finding while plaintiff's semi-disavowance of the type of Communist he is does not ring true and has no substance.

With that major premise either proven or admitted we proceed to the next point, viz., that it is both the duty and right of the State of Michigan to protect itself, in any legal manner against those attacking its sovereignty and its very existence. See Michigan Constitution, Section 22, Art. II and Dennis v. United States, supra. Michigan's past efforts have evidently been without fruition, at least they apparently have not been effective against Communism in our State.

Petitioner's counsel admitted at the hearing and in their briefs that the Communism which is the objective of the so-called Trucks Act is a menace from which the State of Michigan has the right to protect itself, but assert that the Michigan legislature has attempted to do so in a manner not consistent with our federal constitution. In other words, the means adopted are not the proper ones.

Our experience indicates that such would be the Communists' contention no matter what law was enacted. What the Communists in truth are saying is that the State of Michigan is powerless to do what it has the right and duty to do.

Our answer to this is that there is no law that requires any state to pass legislation that meets the approval of the wrongdoers it would seek to restrain. While every safeguard should be thrown around our liberties enumerated in the first, fifth and fourteenth amendments, the constitutional objectives of our forefathers should likewise be kept in mind and we should not interpret that constitution by high sounding words and phrases which have the effect of shackling every act that tends to achieve those objectives while permitting the rogue and destructionist to continue his nefarious acts.

As Chief Justice Vinson said in the Dennis case [341 U.S. 494, 71 S.Ct. 867], supra:

"To those who would paralyze our Government in the face of impending threat by encasing it in a semantic straitjacket we must reply that all concepts are relative."

In the case at bar plaintiff seeks the shield of our constitution long enough so that he may prepare and equip himself to destroy the very constitution and government that gives him that protection. If we stand by, being informed and forewarned by the Communists of their intentions, and do not seek to save ourselves from destruction, then we have encouraged and invited what we will eventually receive.

We are engaged in no sham battle. It is a matter of survival. The Trucks Act may not be ideally balanced or constructed but, under our Michigan Severability Clause, C.L.1948, Sec. 8.5, such questioned provisions of this act will be examined by our courts when they do become issues. As Judge Simons so well distinguishes, the question before this court is a comparative-

ly narrow one and where the act is attacked by plaintiff it is not unconstitutional.

I concur in his opinion and the writ of injuncton should be denied.

LEVIN, District Judge (dissenting).

There can be no hesitancy in characterizing communism as imminently dangerous to our democratic form of government and to our way of life. Nor can there be any doubt that the Federal Constitution does not deny to the individual states that comprise our Union the right of self-preservation so recently affirmed in and vouchsafed to our Federal Government in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. The courts have found that there is a justifiable basis for legislation directed to the problem.

The court has before it a specific enactment of the Michigan Legislature the application of which, the plaintiffs contend, will violate their constitutional rights. The issue before the court does not raise the problem of the State's possession of constitutional power to protect its democratic form of government, but rather poses the question whether or not the method by which the Legislature has attempted to deal with communism is one which is consistent with the Federal Constitution.

The attempt of the Michigan Legislature to enact into law measures for the control of communism and the Communist Party, as we know them today, is commendable in the highest degree, and courts should be slow to overturn such legislation. Nevertheless, I have come to the conclusion that there are valid constitutional objections to this Act because it invades a field validly pre-empted by Congress and because it denies due process of law as guaranteed by the Fourteenth Amendment.

The Congress of the United States has formally recognized the threat to the country's internal security represented by world communism and has acted with respect to this danger through the Internal Security Act of 1950, Public Law 831, 50 U.S.C.A. § 781 et seq., known as the McCarran Act. Both the Congressional and the Michigan Acts provide for the registration of communist organizations and their members.

The Michigan Act is not limited, as its preamble suggests,[1] to the protection of state employment and the state public school system; its title, the "Michigan Communist Control Law," Sec. 11, and its provisions make it clear that the Act is directed to the control of the same problem with which Congress was concerned in enacting the Internal Security Act of 1950. The intent of the Michigan Legislature is apparent from the final finding of necessity:

"Sec. 12. The need for registration and location of the conspiratorial members of the communist movement and the need for protection against the acts and conspiracies of such persons create an emergency and an imperative necessity."

The principle that a state may not enter a field validly occupied by Congress has long been recognized. Charleston & Western Carolina Railway Co. v. Varnville Furniture Co., 237 U.S. 597, 35 S.Ct. 715, 59 L.Ed. 1137; Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432. While it avoided any statement that could be construed as the formulation of a hard and fast rule, the Supreme Court in Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581, set forth many of the considerations that must influence a decision in this area:

" * * * There is not—and from the very nature of the problem there cannot be—any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress. This Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, has made use of the following expres-

---

1. The finding of the Michigan Legislature is like that of the New York Legislature in the Feinberg Act, Education Law, McK.Consol.Laws, c. 16, § 3022, held constitutional in Adler v. Board of Education of City of New York, 342 U.S. 485, 72 S.Ct. 380. The infiltration of Communists into state employment systems is a local problem with which the states unquestionably may deal.

sions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula. Our primary function is to determine whether, under the circumstances of this particular case, Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. And in that determination it is of importance that this legislation is in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority. Any concurrent state power that may exist is restricted to the narrowest of limits; the states' power here is not bottomed on the same broad base as is its power to tax. And it is also of importance that this legislation deals with the rights, liberties, and personal freedoms of human beings, and is in an entirely different category from state tax statutes or state pure food laws regulating the labels on cans." 312 U. S. at pages 67, 68, 61 S.Ct. at page 404.

Although the subject matter is different, many of the considerations that influenced the decision in the Hines case are also present in the case at bar.

In United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, the court stated that the regulation of foreign affairs is an exclusively federal function. Although there was no conflict with any treaty, executive agreement, or act of Congress, the court held that the domestic policy of the State of New York, affecting a field traditionally a part of its domestic concern, was unconstitutional because in conflict with the foreign policy of the United States as evidenced by our recognition of and resumption of diplomatic relations with the Soviet Union. Mr. Justice Douglas, speaking for the court, said:

"Here we are dealing with an exclusive federal function. If state laws and policies did not yield before the exercise of the external powers of the United States, then our foreign policy might be thwarted. These are delicate matters. If state action could defeat or alter our foreign policy, serious consequences might ensue. The nation as a whole would be held to answer if a State created difficulties with a foreign power. * * *" 315 U.S. at page 232, 62 S.Ct. at page 566.

The Congressional finding in the McCarran Act is to the effect that the problem of communism is not a local one but that communism is a movement world-wide in scope, which has for its objective the overthrow of existing governments and the substitution of governments subject to the domination of a foreign power.

The Michigan Act has defined the "communist party" as "any organization which is substantially directed, dominated or controlled by the Union of Soviet Socialist Republics or its satellites, or which in any manner advocates, or acts to further, the world communist movement." Sec. 3. The Act imposes on the law enforcement officers of this State the task of determining the extent of Soviet influence in specific areas of our society, a determination that must inevitably involve an interpretation of Russian foreign policy and an evaluation of the devices of Soviet policy. Moreover, they must decide which countries are Soviet satellites and which countries are not. The Act is silent as to the standards to be observed by these officers in formulating their opinions. It must be readily apparent that this legislation—particularly if multiplied forty-eight times—could seriously embarrass the Federal Government in a peculiarly sensitive international area.

The Internal Security Act is based on grants of powers to Congress [2]—the power

---

2. Internal Security Act, 50 U.S.C.A. § 781(15).
" * * * Congress, in order to pro-

vide for the common defense, to preserve the sovereignty of the United States as an independent nation, and to guar-

to provide for the common defense, to preserve the sovereignty of the United States as an independent nation, and to secure to each state a republican form of government. To the extent that the Michigan Act constitutes "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress", Hines v. Davidowitz, supra, 312 U.S. at page 67, 61 S. Ct. at page 404, it is an unconstitutional interference with the Congressional exercise of powers vested in the national government.

That Congress had in mind the welfare of the individual states in passing the Internal Security Act is shown in its declared purpose—"to provide for the common defense * * * to guarantee to each State a republican form of government"—and in its provision that the files of registrants compiled by authority of the Act be open to public inspection. 50 U.S.C.A. § 788(b) [3]

While there is no outright conflict in the purposes of the registration provisions of the Federal and Michigan Acts, their concurrent application involves important differences in procedure, and these differences could easily lead to frustration of important and clearly indicated Congressional objectives.

In contrast with the Michigan Act the Federal Act manifests throughout an awareness that Congress is exercising power in the delicate areas protected by the First and Fifth Amendments. The legislative history of the Internal Security Act shows that Congress was concerned with the constitutional rights of individuals affected by the Act and sought to provide for their protection. The report of the House Committee on Un-American Activities states:

"The committee approached the problem with care and restraint because it is believed essential that any legislation recommended be strictly in accordance with our constitutional traditions. How to protect freedom from those who would destroy it, without infringing upon the freedom of all our people, presents a question fraught with constitutional and practical difficulties. We must not mortally wound our democratic framework in attempting to protect it from those who threaten to destroy it." 2 U.S.Code Cong.Serv. 1950, p. 3888.

The registration system devised by Congress manifests a real attempt to preserve constitutionally protected liberties. Administrative hearings are accorded to both individuals and organizations. Standards are provided by which the administrative decision is to be made. Judicial review of questions of law and an opportunity, through court order, to have new evidence considered by the Subversive Activities Control Board are allowed, and determinations of the Board are not considered final until ju-

---

antee to each State a republican form of government, enact appropriate legislation recognizing the existence of such worldwide conspiracy and designed to prevent it from accomplishing its purpose in the United States."

3. Intent is an important factor in determining whether or not a federal statute has pre-empted a field. This is particularly true when Congress acts in a field "traditionally occupied" by the states. Then Congressional intent is decisive; the state act will not be struck down unless there is actual conflict or it is clear that Congress intended to preclude state action. Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447; Allen-Bradley Local v. Wisconsin Employment Relations Bd., 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154. But even then such intent need not be expressly stated. The Supreme Court has been quick, for instance, to strike down state legislation in the labor-management field that conflicts or could lead to conflicts with the objectives and policy of the Taft-Hartley Act, even though that Act expressly reserves the right to the states to act in the same field. Hill v. Florida, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782; Bethlehem Steel Co. v. New York State Labor Relations Bd., 330 U. S. 767, 67 S.Ct. 1026, 91 L.Ed. 1234; La Crosse Tel. Corp. v. Wis. Bd., 336 U. S. 18, 69 S.Ct. 379, 93 L.Ed. 463; Plankinton Packing Co. v. Wisconsin Employment Relations Bd., 338 U.S. 953, 70 S. Ct. 491, 94 L.Ed. 588; International Union of United Automobile, etc., Workers of America, C.I.O. v. O'Brien, 339 U.S. 454, 70 S.Ct. 781, 94 L.Ed. 978; but see Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 69 S.Ct. 584, 93 L.Ed. 691.

dicial review has been had or the time for appeal has lapsed. Information given to the Government under the provisions of the Internal Security Act is not admissible as evidence in a criminal trial. 50 U.S.C.A. § 783(f).

The Congressional intent seems to have been to establish a national system that would yield the information Congress deemed necessary to combat the communist danger on all levels with as little interference with individual liberties as possible. It is unlikely that Congress intended to have this system undermined by less carefully considered legislation in the individual states directed to the same objective.

The Michigan Act offers no protection other than the right to defense in a criminal trial. No administrative hearings are afforded either to organizations or individuals.

The conclusion reached in the Hines case is pertinent here:

"* * * The legislative history of the Act indicates that Congress was trying to steer a middle path, realizing that any registration requirement was a departure from our traditional policy of not treating aliens as a thing apart, but also feeling that the Nation was in need of the type of information to be secured. Having the constitutional authority so to do, it has provided a standard for alien registration in a single integrated and all-embracing system in order to obtain the information deemed to be desirable in connection with aliens. * * * it plainly manifested a purpose to do so in such a way as to protect the personal liberties of law-abiding aliens through one uniform national registration system, and to leave them free from the possibility of inquisitorial practices and police surveillance that might not only affect our international relations but might also generate the very disloyalty which the law has intended guarding against."

312 U.S. at page 73, 61 S.Ct. at page 407.·

The Congressional purpose manifested in the safeguards erected in the McCarran Act could be thwarted and ultimately rendered meaningless were acts like the Michigan Act here in question put into operation in each or any of the forty-eight states.

Taking into account all the relevant considerations—the interference by the provisions of the Michigan Act with the exclusive control of the Federal Government over the conduct of foreign affairs, the duplication of purpose and result, the manifest intent of Congress to protect fundamental rights and the frustration of that purpose which would result if the registration provisions of the Michigan Act were permitted to stand—I feel that the registration provisions of the Internal Security Act of 1950 have pre-empted the field.[4]

But even if Congress had not pre-empted the field, the Michigan Act would fail to meet the standard of due process. Registration, the method employed by the Legislature in its attempt to check communism, is, of course, not of itself violative of the Fourteenth Amendment. People of State of N. Y. ex rel. Bryant v. Zimmerman, 1928, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184. But the due process clause of that Amendment is offended because the definitions contained in the Act are too vague and indefinite to afford due process of law to those affected by its provisions. Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840; Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888.

The definitions of "communist party" and "communist" are fundamental to the entire Act; if they fail to meet the constitutional test every section of the Act in which they appear must fall.

The "communist party" is declared, for the purposes of this Act, to be "any organization which is substantially directed, dominated or controlled by the Union of Soviet Socialist Republics or its satellites, or which

4. The legislative history of the Internal Security Act indicates that Congress did not intend to outlaw the Communist Party but preferred to leave to the states control over elections held within their territory. U.S.C.Cong.Serv., 1950, 81st Cong., 2nd Sess., Vol. 2, p. 3890. In view of this evidence of legislative intent it cannot be said that Congress has pre-empted such action by a state.

in any manner advocates, or acts to further, the world communist movement." A person who is a member of ("notwithstanding the fact that he may not pay dues to, or hold a card in * * *") or who contributes "funds or any character of property" to the "communist party" is defined as a "communist". A "communist front organization" is defined as "any organization, the members of which are not all communists, but which is substantially directed, dominated or controlled by communists or by the communist party, or which in any manner advocates, or acts to further, the world communist movement."

The Michigan Legislature makes no findings as to the nature of the world communist movement. With respect to communist front organizations, the Attorney General is to make and publish a list of such organizations. No hearing is afforded either organizations or individuals prior to criminal indictment and trial for failure to register under the Act. No standards other than those set forth in the definitions are provided in the Act.[5] The loose nature of these definitions can be seen in the fact that the second definitions of both "communist party" and "communist front organization" (the disjunctive "or" is used in both Sec. 3 and Sec. 4) are identical.

Moreover, to be a "communist" under the Michigan Act a person need not be a member of the "communist party," or have any connection with the party at all;

he may be one who "commits or advocates the commission of any act reasonably calculated to further the overthrow of the Government of the United States of America, the Government of the State of Michigan, or the government of any political subdivision of either of them by force or violence." [6]

The definitions contained in the Act are designed to avoid limiting the operation of the Act to the recognized Communist Party and its affiliates operating in Michigan. They delegate to the enforcement authorities of the State power arbitrarily to label individuals and organizations as Communists and to subject such possibly innocent individuals, if they would defend themselves, to the shame and ignominy of a criminal trial.

The Act before the court cannot be said to meet the test of due process as it has been enunciated from time to time by the Supreme Court. That some of the persons to whom it was intended to apply can be ascertained, is not enough to save an act otherwise so uncertain and potentially arbitrary in its terms and application.

Nor are the plaintiffs Albertson, admittedly a member of the Communist Party of Michigan, (but who does not admit he is a "communist" within the Act's definition) and the Party itself precluded from asserting this objection simply because the Legislature in drafting this Act attempted to include them. In Thornhill v. Alabama, 310 U.S. 88, 98, 60 S.Ct. 736, 742, 84 L.Ed.

5. Contrast the McCarran Act's detailed legislative finding concerning the world communist movement, the definition of a "Communist-action organization" as one that "operates primarily to advance the objectives of such world Communist movement as referred to * * *" the detailed standards set forth for determining whether a specific organization is a "Communist-front organization"; and the requirements of an agency finding as to every organization that insures uniformity of application. From information received from the Subversive Activities Control Board established under the Act, hearings with respect to the Communist Party of the United States have been in progress for approximate-

ly fourteen months, the Board has heard twenty-six witnesses, and the transcript of the testimony is over 4500 pages. The proceedings have not been concluded.

6. There is nothing in the Dennis case to indicate, nor is it logical to suppose, that everyone guilty of violating the Smith Act, 18 U.S.C.A. § 2385, is a Communist. It is common knowledge that there have been in the past, that there may be in the present and perhaps will be in the future, organizations and individuals in no way connected with and, in fact, opposed to communism who may be subject to conviction under the Smith Act.

1093, it was held that the statute must be judged upon its face and that, "where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression."

There is another aspect of this enactment equally repugnant to the due process clause of the Fourteenth Amendment. The registration required by the Act is not limited to mere identification of "communist party" or "communist front organizations" and their members. It must include not only the name, "including any assumed name used or in use," address, business occupation, and place of birth of the registrant, but the purpose of his presence in the State, the sources of his income, his places of former residence, and "features of identification, including fingerprints * * * organizations of which the registrant is a member; names of persons known by registrant to be communists or members of any communist front organization;" and "any other information requested by the Michigan State Police which is relevant to the purposes of this Act." Sec. 5(b).

Officers of these organizations must give under oath the name of the organization, the names of members who have been in Michigan for thirty days, the names of any persons who have attended their meetings, a financial statement and "any other information * * * which is relevant to the purposes of this Act." Such organization officers must not only register but must report at "such intervals as are directed by the Michigan State Police." Sec. 5(c). The registration records are to be open at all times to any law enforcement officer of the United States or of the State or any political subdivision of either, and such records may also, at the discretion of the Michigan State Police, be open for inspection by the general public.

The questions relevant to this Act which must be answered under oath as a part of the registration procedure may extend to much more than the mere admission of communism, which itself has been held by the Supreme Court to be incriminating. Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170; see also Alexander v. United States, 9 Cir., 181 F.2d 480. The Act contains a section creating the crime of sabotage, a crime punishable by as much as a twenty-year prison term. It also contains a definition of "communism" substantially in the language of the Smith Act and the Michigan Little Smith Act. Thus the registration required by the Act includes much more than mere identification; it requires (at the option of the police) sworn testimony concerning serious crimes punishable by long prison terms, and makes the failure to give such testimony a crime punishable by a maximum of ten years' imprisonment.

The Michigan law before the court compels those to whom it applies, on pain of imprisonment for as many as ten years or fine of not more than $10,000, to testify with respect to criminal activities; it, in effect, forces a man to take the stand and testify at his own criminal trial. The individual who registers under the provisions of this Act, subjects himself to the real danger of indictment under the Michigan Little Smith Act and by the admission required in his registration he deprives himself of the possibility of an effective defense to the charge. The Supreme Court has never gone so far as to say that such a procedure accords with due process of law. In Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, the court reasoned that procedures that depart radically from our traditional concepts of fairness do not afford due process of law even though that guaranty under the Fourteenth Amendment does not include the literal protections of the Fifth Amendment. In giving a person a choice between a prison term for failure to register and the opportunity to testify under oath concerning his criminal activities, the Act offends the Fourteenth Amendment's guaranty of due process of law.

There is another reason for finding that the Act violates the guaranty of due process of law of the Fourteenth Amendment.

This Act does not balance favorably when weighed in the scales with the guaranties of the First Amendment which must be observed in according due process of law. The enforcement of this Act would constitute a continuing threat to freedom of speech and assembly. To be subject to its sanctions one need not be guilty of any subversive thought or act. To be prosecuted under the Act one need only have failed to register and have belonged or made financial contributions to an organization that acts "in any manner" to further the world communist movement. The world communist movement embraces not only the plan of a world revolution to result in the destruction of all that freedom loving people hold dear, but also espouses, though with a complete absence of sincerity, ideas, theories, and non-violent policies which to a greater or less degree are shared by many loyal citizens who abhor communism. This Act, if allowed to stand, will contribute to the creation in this country of that phenomenon so familiar in totalitarian countries,—the public advocacy on the part of law-abiding citizens of a stereotyped political ideology and the stifling of the kind of free inquiry and investigation into the whole realm of political ideas that has characterized the growth of our democracy. I believe that the particular means here employed to combat the danger of communism constitute an arbitrary exercise of police powers that, by unnecessary interference with the guaranties of free speech and assembly, violate the due process clause of the Fourteenth Amendment.

The Legislature is not powerless to deal with subversives. The convictions sustained in Dennis v. United States, supra, point the way to state control of the serious problem which confronts us by those within our midst who would destroy our Government. Such persons can be dealt with by the Michigan authorities by existing statutes and by such further legislation, consistent with the Federal Constitution, as the Legislature may choose to enact.

The provisions of the Michigan Act complained of do not meet constitutional standards and for these reasons I would enjoin their enforcement.